Dorothy F. DONNELLY, Gabriele Kass–Simon, Josie P. Campbell

v.

RHODE ISLAND BOARD OF GOVERNORS FOR HIGHER EDUCATION, University of Rhode Island, University of Rhode Island Chapter of the American Association of University Professors.

Civil Action No. 94–0408–T.

United States District Court,
D. Rhode Island.

June 21, 1996.

Robert B. Mann, Mann & Mitchell, Providence, RI, for plaintiffs.

Jay S. Goodman, Providence, RI, for defendants RI Board of Governors for Higher Education and University of Rhode Island.

Marc Gursky, Providence, RI, for defendants University of Rhode Island Chapter of the American Association of University Professors.

*OPINION AND ORDER*

TORRES, District Judge.

This is an action for injunctive relief and damages brought pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. (1994), and the Rhode Island Fair Employment Practices Act, R.I.Gen.Laws § 28–5–1 et seq. (1995). The Plaintiffs claim that the method utilized by the University of Rhode Island (URI) to fix minimum salaries paid to its faculty discriminates against women. After considering the evidence presented during a bench trial and for the reasons stated below, I find that the method is not

discriminatory and that judgment should be entered in favor of the defendants.

### Findings of Fact

URI is a land grant university that competes for faculty with other land grant universities and many private institutions of higher education throughout the United States. The method for establishing faculty salaries at URI depends upon both the status of the particular faculty member and the terms of the collective bargaining agreement (CBA) periodically negotiated between URI and the University of Rhode Island Chapter of the American Association of University Professors (URI/AAUP), the faculty's collective bargaining representative.

The compensation of a newly hired faculty member is the product of negotiation between the university and the individual professor. However, the professor must be paid no less than the applicable minimum salary established by a portion of the CBA referred to as "Plan A."

The process for determining the amount paid to incumbent faculty members is more complex. A faculty member who has not advanced in rank is paid an annual salary equal to his or her previous year's salary plus any applicable "across the board" and/or "merit increases." An "across the board" increase is a fixed percentage of salary that is determined pursuant to the collective bargaining process. Across the board increases apply uniformly to all faculty. A "merit" increase is based upon the particular faculty member's perceived performance and is awarded at the discretion of the university and to the extent that funds are allocated for that purpose by the CBA.

The compensation of incumbent faculty members that have advanced in rank is determined in a similar manner except that the starting point is based on the faculty member's new rank rather than his or her previous year's salary. In either event, like newly hired faculty, incumbent faculty cannot be paid less than the applicable minimum prescribed by Plan A.

Plan A was developed by URI/AAUP and was first proposed for inclusion in the CBA in 1987. Its purpose was to increase the compensation of lower paid faculty and to narrow the differential in the salaries paid to faculty. Plan A has been a part of the three CBAs negotiated since 1987 (i.e., the 1987–1990 CBA, the 1990–1992 CBA and the 1992–1995 CBA) and, on each occasion, was approved by votes of the AAUP membership. Although all three plaintiffs were members of the faculty at URI prior to the implementation of Plan A in the 1987 CBA, they did not initiate their legal challenge to Plan A until 1993 when they filed a charge of discrimination with the Rhode Island Commission of Human Rights.

Plan A divides the academic departments at URI into three groups referred to as Tiers B, C and D.[1] Generally speaking, Tier B consists of the humanities, most of the social sciences and some of the natural sciences; Tier C encompasses pharmacy, economics and most of the natural sciences; and Tier D is made up of accounting, engineering, computer sciences, business and finance.

Under Plan A, a different schedule of minimum salaries is established for each tier. The minimum salaries for Tier D are higher than those for Tier C which, in turn, are higher than those for Tier B. The differences reflect the varying levels of compensation commanded on the open market by faculty in the three categories of disciplines. Thus, the ratios between the minimum salaries in one tier and the minimum salaries in another tier generally correspond to the ratios between the average salaries paid to faculty in the disciplines encompassed by those tiers as revealed by an annual survey of comparable institutions conducted by Oklahoma State University (the "survey").

The minimum salary schedule for each tier establishes a minimum salary for each faculty rank and level within that tier. There are three faculty ranks, to wit: Assistant Professor, Associate Professor and Full Professor, and two or three levels within each rank.

---

1. Plan A initially created 4 tiers designated as A, B, C and D, but tiers A and B were merged by the 1990 CBA.

Thus, there are seven minimum salary levels in each tier which, in ascending order, are: Assistant Professor I, Assistant Professor II, Associate Professor I, Associate Professor II, Full Professor I, Full Professor II and Full Professor III. Advancement from one rank to another is achieved by a promotion based upon merit. Advancement from one level to another is purely a function of seniority.

The Oklahoma State survey collects data regarding the salaries paid to faculty in different academic departments by land grant universities in each of four geographic regions of the United States. From that data, it calculates the average salaries for faculty at each rank within a discipline, both by geographic region and for the nation as a whole. The survey also assigns an index number or multiplier to each discipline which reflects the ratio of compensation between one discipline and another. For example, in computing the multiplier assigned to the English department, the average salary of English professors is compared to the average for professors of the same rank in all other departments. Since the data collected shows that English professors earn 83% of the overall average, English is assigned a multiplier of .83.

The Oklahoma State survey is used by many universities in fixing faculty salaries. Moreover, the results of the Oklahoma State survey are consistent with other similar studies of faculty compensation.

The relationships among the minimum salaries established by Plan A generally correspond very closely to the interdepartmental ratios disclosed by the Oklahoma State survey, but the two sets of ratios are not identical. The principal difference is that the survey assigns a multiplier to each individual discipline, whereas Plan A establishes its minimum salary schedule for each tier by using the same "multiplier" for all disciplines within a tier.

Under Plan A, the starting point for establishing minimum salaries is the calculation of a base faculty salary which is governed by the amount in the overall pool of money allocated by the CBA for faculty compensation. An index number then is established for each tier. In the case of Tiers B and C the index number is the highest multiplier assigned to any department in the tier by the Oklahoma State survey. In the case of Tier D, the index number is more like an average of the multipliers for the departments within the tier. After that process of "rounding off" is completed, a base level minimum salary for each tier is calculated by multiplying the base salary by the index number established for that tier. The base level minimum is then adjusted upward to fix the minimum salaries for higher ranking positions within the tier and downward to fix the minimum salaries for lower ranking positions.

Despite the fact that Plan A takes a tiered approach rather than the department by department approach utilized by the Oklahoma State survey, there is relatively little difference in the ratios of compensation paid to faculty in different disciplines. The reason is that the average salaries revealed by the Oklahoma State survey are clustered in three narrow ranges that correspond to Plan A's three tiers, and there is not much deviation in the amounts paid to faculty in the various disciplines within a particular cluster.

Plan A also departs from a strict application of the Oklahoma State survey data in other ways. For example, there are some minor variations in the way departments are defined. In addition, URI adjusted the base number that, otherwise, would have been assigned to the oceanography department by excluding from the Oklahoma State survey results the salaries paid to the oceanography faculty at URI because those salaries were disproportionately low and distorted the average inasmuch as URI is one of relatively few institutions with an oceanography department. However, those departures are not very significant.

What is significant for purposes of this case is that any modifications that Plan A makes in the ratios of interdepartmental compensation disclosed by the Oklahoma State survey benefit Tier B and C departments. Thus, as already noted, the base numbers that Plan A assigns to Tiers B and C are higher than the Oklahoma State survey multipliers applicable to most of the departments within those tiers. On the other

hand, the base number for Tier D is lower than the multiplier for some of the departments within that tier.

In this case, the plaintiffs' claim of sex discrimination arises from the fact that there is a greater percentage of women in Tier B and C departments than in Tier D departments where the minimum salaries are higher. More specifically, 27% of URI's 528 faculty members are women but 31% of the faculty in Tier B and C departments and only 10% of the faculty in Tier D departments are women.[2] The variations from the 27% "norm" are statistically significant in the sense that they are unlikely to result from a random distribution.

### Discussion and Conclusions of Law

The plaintiffs do not argue that the disparity in gender distribution among the tiers is attributable to any discriminatory practice on the part of URI. Nor do they allege that Plan A results in uneven compensation of women and men within any tier. Rather, they argue that Plan A discriminates against women because, given the disparity in gender distribution among tiers, higher minimum salaries are established for Tier D than for Tiers B and C. The defendants, on the other hand, contend that Plan A merely reflects market rates of compensation and that it is not responsible for any differences in the compensation paid to women and men faculty. In addition, they assert that Plan A's tiered approach in establishing minimum salaries is required by "business necessity."

### I. The Legal Framework:

Title VII makes it unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individuals' race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1) (1994). In this case, the plaintiffs concede that, on its face, Plan A does not make any gender-based distinction. Nevertheless, they argue that Plan A is discriminatory because it establishes higher minimum salaries for faculty in Tier D disciplines where the percentage of women is relatively small than it does for faculty in Tier B and C disciplines where the percentage of women is larger. Claims of this genre are referred to as disparate impact claims.

■ The doctrine of "disparate impact" recognizes that even though an employment practice is not motivated by a discriminatory purpose and does not expressly make any class based distinctions, the practice may be discriminatory if it adversely affects members of a protected class to a greater degree than non-members. As the Supreme Court has said, disparate impact occurs when "facially neutral" employment policies "fall more harshly on one group than another and cannot be justified by business necessity." *International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 1854 n. 15, 52 L.Ed.2d 396 (1977).

■ In employment cases, there is a well-established analytical framework that is utilized in assessing the merits of a disparate impact claim. Initially, it is incumbent upon the employee to establish a *prima facie* case by proving:

1. that the employer adheres to a particular employment practice;

2. that the practice has "a disparate impact on a group characteristic ... that falls within the protective ambit of Title VII;" and,

3. that there is a "causal relationship between the identified practice and the disparate impact."

*E.E.O.C. v. Steamship Clerks Union, Local 1066,* 48 F.3d 594, 601 (1st Cir.) (citations omitted), *cert. denied,* —— U.S. ——, 116 S.Ct. 65, 133 L.Ed.2d 27 (1995).

■ Once a *prima facie* case is established, the onus shifts to the employer either to come forward with evidence rebutting the plaintiff's proof or to demonstrate that, even though the challenged practice may have a disparate impact, it "is job related for the

---

**2.** See Appendix A for more detailed statistics regarding the distribution, by gender, in the various tiers.

position in question and consistent with business necessity." 42 U.S.C. § 2000e–2(k)(1)(A)(i), (B)(ii) (1994); *Steamship Clerks,* 48 F.3d at 602.

◼ If the employer chooses the rebuttal route, it must present countervailing evidence sufficient to negate one or more of the elements of the *prima facie* case. The statute is somewhat ambiguous as to where the ultimate burden of proving disparate impact resides. Section 2000e requires the *employee* to "demonstrate that [the challenged employment practice] causes a disparate impact...." § 2000e–2(k)(1)(A)(i). On the other hand, § 2000e–2(k)(1)(B)(ii) relieves the employer from the obligation to demonstrate "business necessity" if the *employer* "demonstrates that [the challenged] employment practice does not cause the disparate impact...."

◼ Although there is a paucity of authority on the subject, logic, legislative history and scholarly comment suggest that the statute should be construed as placing the burden of persuasion on the employee. Since it is the employee who is claiming disparate impact, it seems reasonable to construe the statute as imposing on the employee the burden of proving it. That construction is buttressed by the observations of various commentators that Congress manifested its intention to place the burden on claimants when it adopted the 1991 amendments to Title VII. *See,* Lex K. Larson, *Civil Rights Act of 1991* 21 (1992); 2 Arthur Larson & Lex K. Larson, *Employment Discrimination* § 21.04 (1994); Rosemary Alito, *Disparate Impact Discrimination Under the 1991 Civil Rights Act,* 45 Rutgers L.Rev. 1011, 1021–22 (1993). Moreover, such an interpretation is in accord with the law as it existed prior to the 1991 amendments. *See, e.g., Spaulding v. University of Washington,* 740 F.2d 686 (9th Cir.) ("[T]he requirements of a prima facie disparate impact case ... 'are in some respects more exacting than those of a disparate treatment case.' ... Plaintiffs must prove not merely circumstances raising an inference of discriminatory impact; they must prove the discriminatory impact at issue."), *cert. denied,* 469 U.S. 1036, 105 S.Ct. 511, 83 L.Ed.2d 401 (1984) *and overruled by*

*Atonio v. Wards Cove Packing Co.,* 810 F.2d 1477 (9th Cir.1987) (overruled on different grounds). Since Congress, presumably, was aware of pre-existing law on the subject, it must be inferred that if Congress desired to change the law, it would have said so with some clarity.

◼ In cases where the employer opts to defend on the ground that the employment practice is "job related" and consistent with "business necessity," the employer must shoulder the burden of proving that defense. 42 U.S.C. § 2000e–2(k)(1)(A)(i); *Steamship Clerks,* 48 F.3d at 602. However, even where the employer sustains that burden, the plaintiff still may prevail by demonstrating that there is an alternative non-discriminatory policy that would be consistent with the "business necessity" and that the employer refuses to adopt it. 42 U.S.C. § 2000e–2(k)(1)(A)(ii).

## II. *The Prima Facie Case*

### A. *The Existence of an Employment Practice*

In this case, the challenged practice is Plan A's establishment of lower minimum salaries for Tier B and C departments than for Tier D departments. URI argues that this feature of Plan A is not an "employment practice" of the University but, rather, is merely a reflection of prevailing market rates for faculty compensation over which URI has no control and, therefore, it is not the product of an independent business judgment by the University.

In making that argument, URI relies on *Spaulding v. University of Washington,* which held that:

> allowing plaintiffs to establish reliance on the market as a facially neutral policy for Title VII purposes would subject employers to liability for pay disparities with respect to which they have not, in any meaningful sense, made an independent business judgment.

740 F.2d at 708.

However, *Spaulding* is distinguishable from this case. Although the facts in *Spaulding* are unclear, it appears that, in

that case, the University of Washington paid all of its faculty strictly on the basis of competitive market rates applicable to each academic discipline. In contrast, Plan A involves a degree of selectivity inasmuch as it establishes only minimum salaries that affect a limited number of faculty.

More importantly, despite the fact that Plan A generally mirrors the differences in interdisciplinary compensation revealed by the Oklahoma survey, it is more than simply a mechanical application of market rates. Thus, while the Oklahoma survey provides data on *average* salaries, Plan A prescribes *minimum* salaries for which there is no market and which, by definition, deviate from otherwise prevailing rates. In addition, the Oklahoma survey shows differing levels of compensation for each academic department, but Plan A eliminates some of those differences by grouping the departments into three minimum salary tiers through the process of "rounding off." The result is that, even though the ratios among the minimum salary levels set forth in Plan A generally correspond to the ratios among average salaries disclosed by the Oklahoma State survey, there are some variations. As previously stated, under Plan A the ratio between the *minimum* salaries for Tier B and C and those for Tier D is slightly higher than (i.e., more favorable to the Tier B and C departments) than the ratio between the *average* salaries for Tier B and C departments and those for Tier D departments as indicated by the Oklahoma State survey.

In short, while the minimum salary levels established by Plan A are based upon and generally track the relationships among market rates of compensation, they are not strictly dictated by the market because some adjustments were made in developing those salaries from the data contained in the Oklahoma State survey. Moreover, the decision to establish minimum salaries *per se* represents an independent business judgment because there is no indication that the market compelled the adoption of *any* minimum salary schedule. Therefore, in assessing the plaintiffs' *prima facie* case, the real issues are whether Plan A causes a disparate impact on women and, if so, whether it is justified by some "business necessity."

### B. *Disparate Impact*

■ Proof of disparate impact has two components. First, it requires proof that the practice in question has an *adverse impact* on a protected class. Second, it requires proof that the impact is *disparate*.

■ In order to establish adverse impact, an employee must show that the employment practice in question is associated with some unfavorable effect on the members of a protected class as a group. *Steamship Clerks*, 48 F.3d at 601. In order to establish that the adverse impact is disparate, the employee must show that the unfavorable consequences are borne disproportionately by the members of the class in comparison to non-members who are similarly situated. *Id.* In non-class action litigation, the employee also must demonstrate that the employment practice adversely affects him or her as an individual. *Robinson v. Polaroid*, 732 F.2d 1010, 1016 (1st Cir.1984) (citation omitted).

### 1. *Adverse Impact*

In this case, there is no indication that Plan A, in any way, diminishes the compensation paid to women faculty. On the contrary, the effect of Plan A is to *increase* the compensation paid to some faculty from market rates to the minimum salary level. Nor does Plan A prevent a faculty member from earning *more* than the minimum. Indeed, the evidence shows that the overwhelming majority of URI faculty are paid salaries higher than the minima established for their positions. Instead, the adverse impact alleged by these plaintiffs is that, under Plan A, "faculty members in Groups B and C, with the same rank and the same number of years in rank as faculty in Group D, are paid a lower minimum salary than those in Group D." Pl.'s post-trial mem. at 10.

■ The propriety of comparing Tier B and C salaries to Tier D salaries will be discussed later. However, even assuming *arguendo*, the validity of such a comparison, the fact that lower minimum salaries are established for Tiers B and C does not, by

itself, demonstrate any unfavorable effect on women as a class.

▆ In order to establish that Plan A has an adverse impact on women, the plaintiffs must show that a disproportionate number of those *actually receiving* minimum salaries are women. The mere fact that women are more heavily represented in Tiers B and C is not sufficient. The relevant inquiry is not what percentages of men and women are in each tier. Rather, it is what the gender breakdown of those receiving the minimum salaries applicable to Tiers B and C on the one hand, and those receiving the minimum salaries applicable to Tier D, on the other hand. It is only by making that comparison that one can determine whether, under Plan A, the minimum salaries actually paid to women are lower than the minimum salaries paid to men. For example, if most of the faculty who are being paid higher Tier D minima are women and most of those being paid lower Tiers B and C minima are men, it would be patently illogical to conclude that Plan A adversely affects women.

▆ In this case, the plaintiffs have not demonstrated any imbalance between the gender distribution of minimum salary recipients in Tier D vis-a-vis Tiers B and C. They have presented no evidence, whatever, with respect to the numbers of women and men who make up the minimum salary recipients in each tier. Therefore, there is no basis for concluding that Plan A causes women to be paid less than men.

If anything, the evidence shows that Plan A benefits women by narrowing the differences in compensation paid on the open market to faculty in Tier D departments as opposed to faculty in Tier B and C departments. As already noted, because of the "rounding off" method utilized by Plan A, the differential between the minimum salaries established for Tier B and C disciplines and those established for Tier D disciplines is less than the differential between the average salaries commanded by faculty in those two groups as reflected in the Oklahoma State survey. That is not surprising because one of the Union's objectives in devising Plan A was to increase the compensation paid to faculty in the lower tier disci-

plines relative to the compensation paid to faculty in the higher tier disciplines.

### 2. *Disparate Impact*

▆ In order to establish that an employment practice has a *disparate* impact on members of a protected class, there must be a showing that the adverse effects of the practice fall more heavily on members of the class than they fall on non-members who are similarly situated. *Steamship Clerks,* 48 F.3d at 601. Consequently, in order to insure a valid comparison, the first step in the analysis is to select samples that are truly comparable. To put it another way, care must be taken to be sure that the comparison is one between "apples and apples" rather than one between "apples and oranges." *See, Wards Cove Packing Co. v. Atonio,* 490 U.S. 642, 651–52, 109 S.Ct. 2115, 2122, 104 L.Ed.2d 733 (1989) (where racially discriminatory practices are alleged in hiring skilled workers, the racial composition of the skilled workforce must be compared to the "pool of qualified job applicants" or the "qualified population in the labor force," rather than to unskilled workforce). The initial burden of demonstrating that the samples selected are comparable rests on the employee in presenting his or her *prima facie* case.

In this case, the alleged disparities are based on a comparison between the minimum salaries established for Tier D disciplines and those established for Tier B and C disciplines. However, the evidence demonstrates that the market levels of compensation paid to faculty in those two groups is far from comparable. The Oklahoma State survey reveals that faculty salaries vary according to the academic disciplines taught and that they fall into three distinct clusters that correspond to the tiers established by Plan A. The lowest paid disciplines are those in Tiers B and C and the highest paid disciplines are those in Tier D. Consequently, comparing Tier D minimum salaries to Tier B and C minimum salaries is akin to comparing "apples and oranges."

### C. *Causation*

▆ Title VII proscribes employment practices that discriminate "because of" an

employee's gender. In disparate impact cases, this translates into a requirement that an employee demonstrate a causal connection between the employment practice and the alleged discrimination. 42 U.S.C. § 2000e–2(k)(1)(A)(i) (1994). Establishing such a causal relationship requires a showing that "it is the application of a specific or particular employment practice that has created the disparate impact under attack." *Wards Cove*, 490 U.S. at 658, 109 S.Ct. at 2125.

In this case, determining whether the causation requirement has been satisfied turns on how the alleged disparate impact is defined. If the disparate impact is simply the fact that minimum salaries in Tier D are greater than minimum salaries in Tiers B and C, Plan A obviously is the culprit because it expressly provides the method for establishing the minima.

If, on the other hand, the alleged disparate impact is that women are paid lower minimum salaries than men, proof of causation is lacking. There is no evidence that, in fact, women receive lower minimum salaries than men receive. Nor is there any evidence that without Plan A, salaries paid to women would be higher relative to salaries paid to men than they are under Plan A. On the contrary, as previously stated, the Oklahoma State survey demonstrates that faculty in Tier D disciplines generally command higher salaries on the open market than do faculty in Tier B and C disciplines and that, if anything, Plan A narrows those differences at least insofar as minimum salaries are concerned.

The plaintiffs have obfuscated the issue by using these two concepts interchangeably in referring to the alleged disparate impact. In so doing, they fail to recognize that demonstrating a differential between the minimum salaries paid to Tier D faculty and those paid to Tier B and C faculty is merely the first step in proving disparate impact. In order to establish that women, as a class, have been adversely affected there also must be a showing that the differential translates into lower minimum salaries for women relative to men.

Here, no such showing has been made. Moreover, there is nothing to indicate that any differences that may exist in the compensation paid to women and men is "caused" by Plan A. Indeed, the evidence overwhelmingly demonstrates that any such differences are attributable not to Plan A but rather to the fact that women are more heavily represented in disciplines that command lower market salaries and that the reason for the malapportionment is that more women opt to teach those disciplines. Thus, it is undisputed that the distribution among tiers is no different from the gender distribution among departments making up those tiers at similar institutions across the nation and that the distribution is a product of choices made by individual faculty members in selecting their fields of study at both the undergraduate and graduate school levels.

### III. *Business Necessity and Alternative Practices*

Most of the evidence that URI relies upon to establish its "business necessity" defense overlaps the evidence presented to rebut the plaintiffs' *prima facie* case. For that reason and because the plaintiffs have failed to prove at least two elements of their *prima facie* case, there is no need to devote a great deal of attention to either the "business necessity" defense or the possible existence of nondiscriminatory alternatives to Plan A.

Nevertheless, several observations should be made. First, it should be noted that URI has failed to demonstrate that business necessity requires the establishment of minimum salaries *per se*. There is no evidence that URI must adopt *a* minimum salary plan in order to compete for faculty. However, here, the absence of such evidence is inconsequential because these plaintiffs do not challenge Plan A on the ground that it establishes *a* minimum salary plan. On the contrary, they have carefully refrained from asking that Plan A be invalidated, in its entirety, thereby eliminating minimum salaries altogether. Instead, they seek to preserve a system of minimum salaries but demand that the method of calculating those salaries be changed. Consequently, the issue presented is not whether it is consistent with business necessity to establish *a* minimum

salary schedule. Rather, the issue is whether, if such a schedule is adopted, it is consistent with business necessity to establish the multi-tiered schedule prescribed by Plan A.

Like many other provisions in § 2000e, the provisions relating to the "business necessity" defense are ambiguous. The statute provides that an employment practice is not unlawful on disparate impact grounds if it is job related and "consistent with business necessity." § 2000e–2(k)(1)(A)(i). The terms "consistent with" and "necessity" connote two different notions. Two things are consistent with one another if they are in harmony as opposed to being in conflict. *Merriam–Webster's Collegiate Dictionary* 274 (10th ed.1993). On the other hand, something is a necessity if it is required or compelled. *Id.* at 776. Since § 2000e–2(k)(1)(A)(i) uses these terms conjunctively, it is not clear whether Congress intended the standard to be that adherence to the challenged practice is required to conduct the employer's business; that the practice is closely related to a legitimate business purpose; or something in between.

This question appears to be one of first impression, but the history of the 1991 amendments to Title VII provide several indicia of Congressional intent.[3] Section 2000e–2(k)(1)(A) was designed to codify the concepts of "business necessity" and "job relatedness" as they existed before the Supreme Court's decision in *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642, 109 S.Ct. 2115, 104 L.Ed.2d 733 (1989). Prior to *Wards Cove*, those terms embodied two seemingly inconsistent concepts that appeared to have been applied interchangeably in disparate impact cases. The term "business necessity" implied the requirement of a compelling business need whereas the term "job relatedness" implied only a connection to job performance. *Wards Cove* apparently was perceived by some members of Congress as eliminating any need to demonstrate a real business necessity for the challenged practice, and they sought to statutorily reinstate the requirement. Others in Congress

apparently were opposed to suggesting that an employer be required to demonstrate that the challenged practice was indispensable to the conduct of its business. The result was a compromise manifested by the introduction of "a new, seemingly watered-down version" of the previous business necessity doctrine that is represented by the language "consistent with business necessity" now incorporated into § 2000e–2(k)(1)(A)(i). *See* 2 Arthur Larson & Lex K. Larson, *Employment Discrimination* § 23.04[1] (1994).

One indication of that compromise is provided by the fact that earlier drafts of the 1991 amendments to § 2000e–2(k)(1)(A)(i) used the phrase "*required* by business necessity." Larson, *supra,* at § 23.04[1] (emphasis added). The later substitution of the word "consistent" strongly suggests that Congress meant to require something less than a showing of indispensability.

A further clue to Congress' intent may be found in § 2000e–2(k)(1)(A)(ii) which permits an employee to overcome a showing of business necessity by demonstrating the existence of non-discriminatory alternative practice. If the business necessity defense required a showing that the employer had no choice except to adhere to the challenged practice, no alternative practice could exist and § 2000e–2(k)(1)(A)(ii) would be meaningless.

▇▇▇ Thus, although the statute reintroduces some of the confusion that existed before *Wards Cove*, it does indicate that the term "consistent with business necessity" requires something less than a showing that the challenged practice is essential to the conduct of the employer's business but something more than a showing that it serves a legitimate business purpose. What it appears to require is proof that the challenged practice is reasonably necessary to achieve an important business objective.

In this case, URI has identified an important business reason for utilizing a three tiered schedule of minimum salaries rather than the single tiered schedule advocated by

---

**3.** An excellent discussion of the history and purpose of the 1991 amendments to § 2000e–2(k)(1)(A) may be found in 2 Arthur Larson & Lex K. Larson, *Employment Discrimination* § 23.04[1] (1994).

the plaintiffs. The evidence shows that there is a significant differential in the market salaries commanded by faculty teaching the three groups of disciplines corresponding to Plan A's tiers and that the minimum salaries prescribed by Plan A fairly accurately mirror those differences. Moreover, by definition, minimum salaries establish levels of compensation that are higher than market rates. Raising all minimum salaries to Tier D levels, as the plaintiffs urge, would further increase the premium above market rates now being paid to minimum salary recipients in Tiers B and C. The additional cost of doing that would be approximately $4.5 million per year which, obviously, would reduce the amount of money available for other purposes. Nor is there any discernible business benefit that URI would derive from the additional expenditure. The net result of this approach would be merely to increase the amount spent for faculty services that could otherwise be obtained at a lower cost.

The alternative of lowering all minimum salaries to Tier B or Tier C levels is not one that even the plaintiffs advocate. It would not give the women in those tiers anything that they do not already have. What it would do is eliminate or greatly diminish the applicability of the minimum salary schedule to Tier D faculty and, likely, reduce the compensation of Tier D professors who are minimum salary recipients. Since faculty teaching Tier D disciplines generally are more highly compensated, basing minimum salaries solely on rates appropriate for the lower paid disciplines effectively would exclude them from the benefits provided by a system of minimum salaries.

██ In short, URI has sustained its burden of proving that Plan A's multi-tiered system is "consistent with business necessi-ty" because it is reasonably necessary to achieve an important business purpose. The plaintiffs, on the other hand, have failed to identify any non-discriminatory alternative that would serve that purpose. They did present brief testimony suggesting that some other universities utilize single tiered minimum salary systems. However, neither the number and identities of those universities nor specifics regarding their plans were provided and there is no evidence that the plaintiffs proposed any of those plans to URI let alone that URI refused to adopt them.

## IV. *The State Law Claim*

The flaws in the plaintiffs' Title VII claim also are fatal to their claim under the Rhode Island Fair Employment Practices Act. R.I.Gen.Laws § 28–5–1 to 41 (1996). The provisions of the Rhode Island statute are very similar to those of Title VII. Furthermore, the Rhode Island Supreme Court has held that the Rhode Island statute is to be interpreted in the same manner as federal courts have interpreted Title VII. *Newport Shipyard v. R.I. Commission for Human Rights,* 484 A.2d 893, 897–98 (R.I.1984); *See, Taylor v. State of Rhode Island, Dept. of MHRH,* 736 F.Supp. 15, 18 (D.R.I.1990). Since the plaintiffs have failed to identify any meaningful difference in the language of the two statutes that is applicable to the facts of this case, their state law claim also fails.

### Conclusion

For all of the foregoing reasons, the Clerk is hereby directed to enter judgment denying and dismissing the plaintiffs' claims and awarding costs to the defendants.

IT IS SO ORDERED.

APPENDIX A

| Tier | # Faculty in Tier | # Males in Tier | # Females in Tier | % of All Males in Tier | % of All Females in Tier | % of Tier That is Male | % of Tier That is Female |
|------|-------------------|-----------------|-------------------|------------------------|--------------------------|------------------------|--------------------------|
| D | 134 | 121 | 13 | 25% | 8% | 90% | 10% |
| C | 105 | 87 | 18 | 18% | 10% | 82% | 18% |
| B | 423 | 277 | 146 | 57% | 82% | 65% | 35% |
| **Total** | 662 | 485 | 177 | 100% | 100% | | |