**Dorothy F. DONNELLY, et al.,
Plaintiffs, Appellants,**

v.

**RHODE ISLAND BOARD of GOVERNORS for HIGHER EDUCATION,
et al., Defendants, Appellees.**

**No. 96–1834.**

United States Court of Appeals,
First Circuit.

Heard Jan. 10, 1997.

Decided April 7, 1997.

---

Lynette Labinger with whom Roney & Labinger, Robert B. Mann and Mann & Mitchell, Providence, RI, were on brief for appellants.

Jay S. Goodman and Fidelma Fitzpatrick with whom William G. DeMagistris, Louis J. Saccoccio, General Counsel, The University of Rhode Island, Marc B. Gursky, Julie A. Thomas and Law Office of Marc Gursky, Providence, RI, were on brief for appellees.

Before STAHL, Circuit Judge, ALDRICH and CAMPBELL, Senior Circuit Judges.

**4**

LEVIN H. CAMPBELL, Senior Circuit Judge.

This appeal is brought by certain women faculty members at the University of Rhode Island from the adverse judgment of the district court. They had sued in the district court for an injunction and damages pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* (1994) and the Rhode Island Fair Employment Practices Act, R.I.G.L. § 28–5–1 *et seq.* (1997). Plaintiffs contend that the University's three-tier faculty salary plan has a disparate impact upon the pay received by women faculty.[1] Each tier of the challenged plan provides for different salary minimums derived, in large part, from data as to the average salaries paid nationally to professors in the same academic disciplines encompassed within that tier. Plaintiffs base their disparate impact claim on the fact that while only 27 percent of the University's entire faculty are women, 31 percent of the faculty clustered within the disciplines included in the lower paying tiers are women, while women make up only ten percent of those in the disciplines included in the highest paid tier.

The district court held a bench trial and thereafter issued a comprehensive Opinion and Order, since published. *Donnelly v. R.I. Bd. of Governors for Higher Educ.,* 929 F.Supp. 583 (D.R.I.1996). It denied relief on two independent grounds: (1) that the plaintiff faculty members had failed to establish a prima facie case of disparate impact; and (2) that, even had such a prima facie case been established, the University had sustained the burden of showing that the plan it followed was consistent with business necessity. *Id.* Because we agree with the district court that the plaintiffs have failed to meet their burden that the University's plan has a disparate impact on female faculty members, we do not reach the issue of business necessity. We affirm the district court's judgment for substantially the same reasons it set out in Sections I, II, and IV of its Opinion and Order. As we adopt the district court's reasoning (other than in Section III of its opinion) we do not undertake a separate statement of our views except for the following brief comments.

Plaintiffs, as the district court shows, have failed to establish all the necessary ingredients of their prima facie case of disparate impact, in particular the "disparateness" of the salary plan's impact on the protected group (women), and the existence of a causal relationship between the plan and any purported disparate impact. *See E.E.O.C. v. Steamship Clerks Union, Local 1066,* 48 F.3d 594, 601 (1st Cir.), *cert. denied,* — U.S. — , 116 S.Ct. 65, 133 L.Ed.2d 27 (1995).

 Thus plaintiffs have not demonstrated that the challenged Plan A has any adverse impact either on women in general or themselves in particular (the latter being required in this non-class disparate impact action, *Robinson v. Polaroid Corp.,* 732 F.2d 1010, 1016 (1st Cir.1984) (citing *Coe v. Yellow Freight Sys., Inc.,* 646 F.2d 444, 451 (10th

---

1. Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991, provides, in pertinent part:

(1)(A) An unlawful employment practice based on disparate impact is established under this subchapter only if—

(i) a complaining party demonstrates that a respondent uses a particular employment practice that causes a disparate impact on the basis of race, color, religion, sex, or national origin and the respondent fails to demonstrate that the challenged practice is job related for the position in question and consistent with business necessity; or

(ii) the complaining party makes the demonstration described in subparagraph (C) with respect to an alternative employment practice and the respondent refuses to adopt such alternative employment practice.

42 U.S.C. § 2000e–2(k)(1)(A) (West 1994).

The Rhode Island Fair Employment Practices Act, as amended in 1991, states, in relevant part:

(a) An unlawful employment practice prohibited by § 28–5–7 may be established by proof of disparate impact. An unlawful employment practice by proof of disparate impact is established when:

(1) A complainant demonstrates that an employment practice results in a disparate impact on the basis of race, color, religion, sex, sexual orientation, handicap, age, or country of ancestral origin, and the respondent fails to demonstrate that the practice is required by business necessity.

R.I.G.L. § 28–5–7.2(a)(1) (West 1997).

Cir.1981).))[2] Nor have they shown that they, or the other female faculty members in Tier B (or Tier C) receive under the Plan salaries that are proportionally lower than those ordinarily paid to *similarly situated* males (i.e. males teaching in the same or comparable academic disciplines) at the University of Rhode Island or at other institutions around the country. In fact, the record strongly indicates that the faculty members, both male and female, in Tier B, the lowest paid tier, are better off than they would be without Plan A and better off than are their academic counterparts in the national market due to features of Plan A that tend to improve the compensation of professors teaching in the lower paid disciplines.[3] The appellants argue, to be sure, that failure to recalculate the index numbers has kept a few disciplines at the University of Rhode Island, like nursing, a predominately female discipline, in tiers that currently underestimate their actual worth in the national market. But there is no indication that other, male-dominated disciplines may not have suffered a similar fate, and, in any event, the fields where this has allegedly occurred are not ones within which appellants teach at the University of Rhode Island.

■ The appellants' proof of the causation aspect of their prima facie case is also deficient. As the district court found, *Donnelly*, 929 F.Supp. at 591–92, the professors' choice of academic field and the workings of the national market, and *not* Plan A, as such, are basically responsible for compensatory differences between tiers within the Plan, these differences being generally established by reference to nationwide faculty salaries within the various disciplines. Most, if not all, higher education institutions in this country display similar discipline-based compensatory disparities; without Plan A, faculty members in Tier B would, on the whole, continue to earn less (probably even less than currently) than those in the higher tiers.[4]

■ The appellants take the disparate impact theory beyond its logical boundaries when they suggest that faculty members in Tier B should be compensated at the same minimum rates as those in the different aca-

2. Contrary to the appellants' contentions, the weight of the authority, both before and after the enactment of the Civil Rights Act of 1991, suggests that the element of impact combines two components: adverseness and disparateness. *Compare* Mack A. Player, Employment Discrimination Law § 5.41, at 356 ("Plaintiff carries the initial burden of proving that a particular device or system *adversely* affects employment opportunities of a defined protected class *when compared* to the effect that device has upon the opportunities of other classes." (emphasis added)), and § 5.54, at 419–21 (1988) *with* Walter B. Connolly, Jr. and Michael J. Connolly, A Practical Guide to Equal Employment Opportunity § 1.02[1][a], at 1–18.1 (1996) ("Disparate impact ... results from facially neutral employment practices that have a *disproportionately negative* effect on certain protected groups ...."(emphasis added)).

It is also common sense that, to avail oneself of statutes, like Title VII and the RI–FEPA, which seek to redress the effects of discriminatory employment practices on protected groups, one would have to show, at the very least, an injury stemming from one or more of those practices (adverse impact) disproportionately borne by members of one or more of those groups (disparate impact).

3. Under Plan A, each academic discipline starts with an index number, from the Oklahoma State University Survey, pegged to the average salary

of assistant professors in that discipline compared to the average salary for all assistant professors. The disciplines are then categorized into tiers and their index numbers are rounded off to the relational factor assigned to their particular tier. Those disciplines relegated to the lowest tier further benefit from Plan A's express goal of narrowing the salary disparities among tiers as careers progress. This goal of convergence has been achieved by allocating a higher portion of the Plan A raises to the faculty members in Tier B.

Plan A actually accounts for only a small percentage of the salary increases annually awarded by the University of Rhode Island. The collective bargaining agreements provide for other salary increases, like performance and merit based awards, that enable exceptional professors in every discipline to earn more than their peers.

4. One can imagine similar scenarios in other professions. For example, a hospital might set up a compensatory scheme in which, because of supply and demand dynamics, doctors in the obstetrics and gynecology department, a larger portion of whom might be female, get paid at a lower rate than those in the field of cardiology containing a higher proportion of males. *See* Jay Green, *Doctors' Salaries Are Rising More Slowly These Days*, The Orange County Register, October 11, 1995, at Business Section.

demic disciplines embraced by Tier D. In so doing, they seem to be introducing a comparable worth argument into Title VII and RI–FEPA analyses. To make out a prima facie case of salary discrimination under Title VII, and also under the RI–FEPA, *see Newport Shipyard, Inc. v. R.I. Comm'n for Human Rights, et al.,* 484 A.2d 893, 898 (R.I.1984) (looking at the decisions of the federal courts construing Title VII for guidance in interpreting the RI–FEPA), a female claimant needs proof that *similarly situated* males were better paid. *Johnson v. University of Wisconsin–Eau Claire,* 70 F.3d 469, 478 (7th Cir.1995) (citing *Weiss v. Coca–Cola Bottling Co. of Chicago,* 990 F.2d 333, 338 (7th Cir. 1993)).[5] The appellants in this case have failed to surmount this initial hurdle in the disparate impact analysis. We affirm the district court's holding that they have failed to make out a prima facie case of disparate impact.

The district court, in Section III of its opinion, went on to address the issue of "business necessity," *Donnelly,* 929 F.Supp. at 592–94. As in the absence of a prima facie case there is no occasion to reach that issue, we take no position on it, nor do we join in the district court's reasoning on that score.

*Affirmed. Costs for appellees.*

---

5. Unlike the respondents in *Connecticut v. Teal,* 457 U.S. 440, 102 S.Ct. 2525, 73 L.Ed.2d 130 (1982), the appellants in this case are in no way denied the opportunity to compete on equal terms with other professors, male and female, in their respective disciplines, nor, were they to satisfy the job-related criteria, to access positions in the higher-paying Tier D disciplines.

In short, contrary to the situation presented in *Liberles v. County of Cook,* 709 F.2d 1122 (7th Cir.1983), the University of Rhode Island, through its three-tiered scheme, is simply paying different people different salaries for different, not similar, work.