Elisha D. HACK, Jeremy A. Hershman, Batsheva Greer, and Lisa B. Friedman, Plaintiffs–Appellants,

v.

The PRESIDENT AND FELLOWS OF YALE COLLEGE d/b/a Yale Corporation and Yale University, Richard H. Brodhead, and Betty Trachtenberg, Defendants–Appellees,

The Rutherford Institute, Amicus Curiae,

The Catholic League for Religious & Civil Rights, Movant.

No. 98–9136.

United States Court of Appeals, Second Circuit.

Argued: March 29, 1999.

Decided: Dec. 28, 2000.

Nathan Lewin, (Richard W. Garnett IV, Miller Cassidy Larroca & Lewin LLP), Washington, DC, for Plaintiffs–Appellants.

Felix J. Springer, (Allan B. Taylor, James Sicilian, Victoria Woodin Chavey, Day Berry & Howard LLP, Dorothy Robinson, Vice President and General Counsel, Yale University, New Haven, Conn., Of Counsel), Hartford, Conn., for Defendants–Appellees.

Kenneth Lasson, Professor Law, University of Baltimore, Baltimore, Md., filed a brief for Amici Curiae Law Professors Laurence Katz, University of Baltimore School of Law, Steven H. Resnicoff, DePaul University College of Law, John W. Welch, Brigham Young University School of Law.

Thomas Marcelle, Slingerlands, N.Y. (Kimball E. Hazelwood, The Rutherford Institute, Of Counsel), filed a brief for Amicus Curiae, The Rutherford Institute.

Kevin J. Hasson, Eric W. Treene, Roman P. Storzer, filed a brief for Amicus Curiae The Becket Fund for Religious Liberty.

Before LEVAL and POOLER, Circuit Judges, and MORAN,* Senior District Judge.

MORAN, Senior District Judge

Yale College (Yale) requires all unmarried freshmen and sophomores under the age of 21 to reside in college dormitories, all of which are co-educational. The plaintiffs were Yale freshmen and sophomores when they brought this suit. They represent that as devout Orthodox Jews they cannot reside in those dormitories because to do so would conflict with their religious convictions and duties. Plaintiffs contend that Yale is a state actor or instrumentality and, therefore, the First, Fourth, and Fourteenth Amendments invalidate the parietal rule pursuant to 42 U.S.C.

---

* Honorable James B. Moran, Senior United States District Judge for the Northern District of Illinois, sitting by designation.

§ 1983; that in any event they are entitled to discovery to explore the interrelationship between Yale and the governments of Connecticut and New Haven; that Yale's mandatory on-campus housing requirement is both an attempt to monopolize a New Haven housing market in violation of § 2 of the Sherman Antitrust Act and a tying arrangement in violation of § 1 of that statute; and that Yale's refusal to exempt religious observers from co-educational housing violates the Fair Housing Act, 41 U.S.C. § 3601 *et seq.*

The district court (Alfred V. Covello, C.J.) granted defendants' motion to dismiss for failure to state a claim upon which relief can be granted, *Hack v. President and Fellows of Yale College,* 16 F.Supp.2d 183 (D.Conn.1998), and plaintiffs appealed. We affirm, with this judge dissenting in part, as explained in section III.B.

I

The threshold inquiry for plaintiffs' constitutional claims is whether Yale can be considered a state actor or instrumentality acting under color of state law. The district court concluded that it could not. We agree.

What constitutes state action has been variously described by courts as "an extremely difficult question," "murky waters," "obdurate," and a "protean concept," *see Krynicky v. University of Pittsburgh,* 742 F.2d 94, 97 (3rd Cir.1984) (citations omitted), as the Supreme Court has grappled with differing factual circumstances, most recently in *American Mfrs. Mut. Ins. Co. v. Sullivan,* 526 U.S. 40, 119 S.Ct. 977, 143 L.Ed.2d 130 (1999). The Court acknowledged in *Lebron v. National RR Passenger Corp.,* 513 U.S. 374, 115 S.Ct. 961, 130 L.Ed.2d 902 (1995), that "[i]t is fair to say that 'our cases deciding when private action might be deemed that of the state have not been a model of consisten-

cy.'" *Id.* at 378, 115 S.Ct. 961 (*quoting Edmonson v. Leesville Concrete Co.,* 500 U.S. 614, 632, 111 S.Ct. 2077, 114 L.Ed.2d 660 (1991) (O'Connor, J., dissenting)). As in *Lebron,* however, we need not "traverse that difficult terrain," 513 U.S. at 378, 115 S.Ct. 961, because plaintiffs rely almost entirely upon *Lebron* in contending that Yale is not, in reality, a private entity but is, rather, an agency or instrumentality of the State of Connecticut for the purpose of individual constitutional rights.

Plaintiffs begin by describing the significant interrelationships between Yale and the state from colonial days well into the latter nineteenth century. To that end they note that Yale is chartered by special legislation and, indeed, that charter is confirmed in the Connecticut Constitution. They contend that Yale was created to further public, governmental objectives, objectives that are equally valid today. Yale, they point out, must submit its budget and financial report to the Connecticut legislature. Finally,[1] they argue that the presence of the Governor and Lieutenant Governor, as *ex officio* members of the nineteen-member "Fellows of Yale College" governing board, provides further support for the conclusion that Yale is a governmental entity.

In *Lebron,* the Supreme Court determined that Amtrak was a governmental entity:

We hold that where, as here, the Government creates a corporation by special law, for the furtherance of governmental objectives, and retains for itself permanent authority to appoint a majority of the directors of that corporation, the corporation is part of the Government for purposes of the First Amendment. *Id.* at 400, 115 S.Ct. 961. In the wake of *Lebron,* other courts have concluded that the Court set forth a three-prong stan-

---

1. Plaintiffs also refer to actions by Yale, the state, and New Haven, to accommodate Yale's large and tax exempt presence in New Haven. They do not, however, and they could not, claim that Yale is an instrumentality of New Haven, and we fail to see how those accommodations materially strengthen their *Lebron* analysis.

dard: only if (1) the government created the corporate entity by special law, (2) the government created the entity to further governmental objectives, and (3) the government retains "permanent authority to appoint a majority of the directors of the corporation" will the corporation be deemed a government entity for the purpose of the state action requirement. *Id.* at 400, 115 S.Ct. 961. *See Barrios–Velazquez v. Asociacion de Empleados del Estado Libre Asociado de Puerto Rico*, 84 F.3d 487, 492 (1st Cir.1996); *Hall v. American Nat'l Red Cross*, 86 F.3d 919, 921–922 (9th Cir.1996); *American Bankers Mortgage Corp. v. Federal Home Loan Mortgage Corp.*, 75 F.3d 1401 (9th Cir.1996); *Abu–Jamal v. National Pub. Radio*, 1997 WL 527349, *4 (D.D.C. Aug.21, 1997), *aff'd*, 159 F.3d 635 (D.C.Cir.1998) (table). Here, the first two factors are easily satisfied: the State of Connecticut created the corporate entity by special law, and higher education is a governmental objective (although not the exclusive province of government). Two of nineteen board members is, however, a long way from control.

Plaintiffs contend that a three-prong test, with one prong requiring "majority" governmental control, is an overly simplistic reading of *Lebron*. They argue that the two highest executive officers of the state are likely to be far more influential than other members, that they carry with them the aura of official action, and that their participation is at least as significant as the Presidential power to appoint a majority of Amtrak board members from specific lists of recommended private sector nominees. We disagree.

We think *Lebron* means what it says. Indeed, the Court there contrasted Comsat with Amtrak, noting that the President appointed only three of fifteen Comsat directors, 513 U.S. at 391, 115 S.Ct. 961, and describing it as a private corporation not government-controlled, *id.* at 397, 115 S.Ct. 961. Moreover, the Court has indicated its reluctance to have the federal courts indulge in evaluations of the effec-

tiveness of governmental persuasion, absent government control. *See San Francisco Arts & Athletics, Inc. v. United States Olympic Comm.*, 483 U.S. 522, 545–546 n. 27, 107 S.Ct. 2971, 97 L.Ed.2d 427 (1987). Plaintiffs do not suggest that Connecticut had any involvement in establishing Yale's parietal rules. It is equally clear that the state could not control Yale's policies and operations even if it chose to become involved. Yale, as a private university, did not act under color of law.

Alternatively, plaintiffs sought discovery about the interrelationships between Yale and the governments of Connecticut and New Haven, but the district court dismissed the complaint before any discovery could be initiated. Plaintiffs claim that a ruling before they had an opportunity to initiate discovery was in error. Again, we disagree.

The motion to dismiss tested the pleadings, and for the reasons we have stated we conclude that the allegations do not state a claim that Yale is a *Lebron* state actor. We have assumed that the governor and lieutenant governor may have attended every board meeting and vigorously participated (although it may be that their role is largely symbolic, a vestigial reminder of a bygone era), but we think that irrelevant. Nor does plaintiffs' contention that discovery might provide a basis for finding state action upon a different theory, such as that enunciated in *Rendell–Baker v. Kohn*, 457 U.S. 830, 102 S.Ct. 2764, 73 L.Ed.2d 418 (1982), provide a justification. In seeking reversal of the dismissal they do not argue that their present pleadings support such an alternative theory. Rather, their contention is more of the nature that through discovery something might turn up, and they are not at all specific about what that might be. The district court, however, was not required to wait for the exploration of such a speculative hope. We note, as well, that plaintiffs have pleaded a wealth of information about the College, and not surprisingly so. Yale is not some obscure organi-

zation largely unknown in the greater community. Government policies and interrelationships are not generally hidden from the public.

## II

Plaintiffs further allege that Yale's requirement that freshmen and sophomores reside in the dormitories is an attempt to monopolize the New Haven student housing market and that it is an illegal arrangement tying the provision of a Yale education to the purchase of unrelated housing services, all in violation of the Sherman Antitrust Act, 15 U.S.C. §§ 1 and 2.

We begin with the observation that if a parietal rule requiring some students to reside in college or university housing runs afoul of the antitrust laws, it has largely escaped the notice of the many colleges and universities across the country that have had and continue to have those rules and the notice of the millions of students who have attended those institutions in the more than a century since the Sherman Act was enacted. In *Hamilton Chapter of Alpha Delta Phi, Inc. v. Hamilton College*, 128 F.3d 59, 64–65 (2d Cir.1997), we noted that only one reported case involved an antitrust challenge to university housing policies. And there, *American Nat'l Bank & Trust Co. of Chicago v. Board of Regents for Regency Universities*, 607 F.Supp. 845 (N.D.Ill.1984), parietal rules similar to those here were not even questioned.

■ When we speak of monopolization or attempted monopolization, we necessarily are talking about monopoly power within a relevant market. Plaintiffs, in their monopolization claim, are somewhat unclear about what constitutes the relevant market. They refer to student housing in New Haven, to the housing market for Yale students, and to non-subsidized rental housing in New Haven. We need not, however, seek to determine the relevant market upon which they purportedly rely

because it is clear that their focus is upon a contractually created class of consumers: unmarried freshmen and sophomores below the age of 21. Plaintiffs do not claim, nor could they, that Yale controls non-Yale rental housing in New Haven, or that changes in the pricing of Yale housing or in other New Haven housing will have the slightest effect upon what those students will do. Yale does not control the supply of housing or student housing generally, but it does control the demand for some of it by its parietal rules. Economic power derived from contractual arrangements affecting a distinct class of consumers cannot serve as a basis for a monopolization claim. *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 438 (3d Cir.1997); *Rohlfing v. Manor Care, Inc.*, 172 F.R.D. 330, 345 (N.D.Ill.1997). If plaintiffs have any antitrust claim it necessarily is that Yale has coerced plaintiffs into accepting a tied product.

That claim, however, fails as well. The law was well-summarized in *De Jesus v. Sears, Roebuck & Co., Inc.*, 87 F.3d 65, 70 (2d Cir.1996):

> "A tying arrangement is 'an agreement by a party to sell one product but only on the condition that the buyer also purchase[ ] a different (or tied) product.'" *Yentsch v. Texaco, Inc.*, 630 F.2d 46, 56 (2d Cir.1980) (quoting *Northern Pac. Ry. v. United States*, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958)). "[T]he essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms." *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 12, 104 S.Ct. 1551, 1558, 80 L.Ed.2d 2 (1984); *see also Allen–Myland, Inc. v. IBM Corp.*, 33 F.3d 194, 200 (3d Cir.) *cert. denied*, 513 U.S. 1066, 115 S.Ct. 684, 130 L.Ed.2d 615 (1994).

As to the detailed requirements to state a tying claim—

[W]e have required allegations and proof of five specific elements before finding a tie illegal: first, a tying and a tied product; second, evidence of actual coercion by the seller that forced the buyer to accept the tied product; third, sufficient economic power in the tying product market to coerce purchaser acceptance of the tied product; fourth, anticompetitive effects in the tied market; and fifth, the involvement of a "not insubstantial" amount of interstate commerce in the "tied" market.

*Gonzalez v. St. Margaret's House Hous. Dev. Fund Corp.*, 880 F.2d 1514, 1516–17 (2d Cir.1989) (citing *Yentsch*, 630 F.2d at 56–57).

*De Jesus*, 87 F.3d at 70.

■ Plaintiffs contend that their dormitory housing is "tied" to their Yale education (the "tying" product) and that Yale has sufficient economic power in the educational market to coerce their payment for that housing. They allege that a Yale degree "has unique attributes that make it without substitute or equal," including the access it provides to Yale's alumni network and its "incomparable value to potential employers and graduate schools." A Yale education, they contend, has advantages not shared by other institutions of higher learning and this is enough for a finding of sufficient market power in the tying product market—or, since they have so alleged, they are entitled to pursue the matter further through discovery.

The district court agreed that the uniqueness of a product can trigger a tying arrangement claim, *see United States Steel Corp. v. Fortner Enterprises, Inc.*, 429 U.S. 610, 620–21, 97 S.Ct. 861, 51 L.Ed.2d 80 (1977), and so do we. That uniqueness can provide sufficient market power to compel a buyer to purchase a product he would not purchase in a competitive market. *See Jefferson Parish*, 466 U.S. at 16–17, 104 S.Ct. 1551; *Lee v. Life Ins. Co. of*

*North America*, 23 F.3d 14, 16 (1st Cir. 1994). Where uniqueness is alleged, questions of market definition and market power will inevitably blend together because the relevant tying product market includes, by definition, only fungible products. "The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it." *Brown Shoe Co. v. United States*, 370 U.S. 294, 325, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962); *see also Town Sound and Custom Tops, Inc. v. Chrysler Motors Corp.*, 959 F.2d 468, 479 (3rd Cir. 1992) ("If a defendant offers a unique and nonreplicable product, . . . other products may not be adequate substitutes for it, and hence are not part of the same market."). Plaintiffs argue, in effect, that the relevant product market is confined to a Yale education. To survive a motion to dismiss, however, the alleged tying product market must be plausible, *see Town Sound*, 959 F.2d at 479 n. 12, and we agree with the district court that the market alleged here is not. *See also Little Caesar Enterprises, Inc. v. Smith*, 34 F.Supp.2d 459, 477 n. 30 (E.D.Mich.1998) ("Courts have consistently refused to consider one brand to be a relevant market of its own when the brand competes with other potential substitutes.") (citing cases).

Plaintiffs insist that there is no substitute for a Yale education, that it is unique, and in a collegiate sense that is undoubtedly so. *See Lee v. Life Ins. Co. of North America*, 23 F.3d 14, 17 (1st Cir.1994) (considering "uniqueness" of the University of Rhode Island). The annual rankings of colleges and universities in *U.S. News and World Report*, however, illustrates the obvious: there are many institutions of higher learning providing superb educational opportunities. Those opportunities are not inherently local. Plaintiffs themselves allege that 92.5 percent of the 1997–1998 freshman class came from outside Connecticut. If some of them, including the plaintiffs, were dissatisfied with the

Yale parietal rules, they could matriculate elsewhere. The antitrust implications of university housing rules do not depend upon a trier of fact deciding that some universities, or certain departments in some universities, are "unique" and others are not.

*Hamilton Chapter of Alpha Delta Phi, Inc. v. Hamilton College, supra,* is not to the contrary. The court there never reached the relevant market issue, and, if it had, the considerations would have been quite different. Plaintiffs in *Hamilton* were "locked in" by their investment in housing which they could no longer use because of an abrupt change in policy. That might have raised the concerns voiced in *Eastman Kodak Co. v. Image Technical Services, Inc.,* 504 U.S. 451, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992), but those concerns are not present here. Yale's housing policies were fully disclosed long before plaintiffs applied for admission. They had no "lock-in" costs.

### III

Plaintiffs further contend that Yale's refusal to exempt religious observers from co-educational housing violates Title VIII of the Civil Rights Act of 1968, known as the Fair Housing Act, 42 U.S.C. § 3601 *et seq.* ("FHA" or "Title VIII"). The Fair Housing Act provides that "it shall be unlawful [t]o refuse to sell or rent . . . or otherwise make unavailable or deny, a dwelling to any person because of . . . religion." 42 U.S.C. § 3604(a). The FHA also prohibits discrimination "in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of . . . religion." 42 U.S.C. § 3604(b).

#### A. *Standing under the Fair Housing Act*

■ The district court did not reach the merits of plaintiffs' Fair Housing Act claims because it concluded that the plaintiffs lacked standing. We disagree. The Act provides that "[a]n aggrieved person may commence a civil action in an appropriate United States district court. . . ." 42 U.S.C. § 3613(a)(1)(A). A party is an "aggrieved person," according to the definition in 42 U.S.C. § 3602(i)(1), if he or she "claims to have been injured by a discriminatory housing practice." The Act requires only that the party "allege 'injury in fact' within the meaning of Article III of the [United States] Constitution, that is, that he allege 'distinct and palpable injuries that are fairly traceable to [defendants'] actions.'" *LeBlanc–Sternberg v. Fletcher,* 67 F.3d 412, 424 (2d Cir.1995) (internal quotation marks omitted) (*citing Havens Realty Corp. v. Coleman,* 455 U.S. 363, 375–76, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982)). The Supreme Court has repeatedly directed the courts to give a "generous construction" to the Fair Housing Act. *See, e.g., Trafficante v. Metropolitan Life Ins. Co.,* 409 U.S. 205, 211–212, 93 S.Ct. 364, 34 L.Ed.2d 415 (1972). "Congress intended standing under § 812 [2] to extend to the full limits of Art. III" and thus courts lack authority to create prudential barriers to standing under the Act. *Gladstone Realtors v. Village of Bellwood,* 441 U.S. 91, 103 n. 9, 109, 99 S.Ct. 1601, 60 L.Ed.2d 66 (1979); *Havens Realty,* 455 U.S. at 372, 102 S.Ct. 1114; *see also Comer v. Cisneros,* 37 F.3d 775, 788–89 (2d Cir.1994) (according plaintiffs "the broadest possible grounds for standing"); *Harris v. Itzhaki,* 183 F.3d 1043, 1049–50 (9th Cir.1999) (same); *Wilson v. Glenwood Intermountain Properties, Inc.,* 98 F.3d 590, 593 (10th Cir.1996) (same, but finding that a favorable decision could not redress the injury). As *Havens Realty, Trafficante* and *Gladstone* make clear, and as *LeBlanc–Sternberg* explained, "[a]n injury need not be economic or tangible in order to confer standing." *LeBlanc–Sternberg,*

---

2. Section 812 of the Fair Housing Act of 1968, previously codified at 42 U.S.C. § 3612, has been repealed and replaced by 42 U.S.C. § 3613(a). *See* Pub.L. 100–430, § 8(2), Sept. 13, 1988, 102 Stat. 1625.

67 F.3d at 425 (*citing Havens Realty*, 455 U.S. at 376, 102 S.Ct. 1114).

The student plaintiffs claim a tangible, economic injury. Indeed, they do not seek to compel Yale to provide single-sex housing; they ask to be relieved of the burden of paying for rooms they contend are effectively "made unavailable" to them. We conclude that they have amply alleged injury in fact and, accordingly, have standing to pursue Fair Housing Act claims.

POOLER, Circuit Judge, with whom LEVAL, Circuit Judge, concurs:

B. *Failure to State a Claim*

Because we disagree with the district court's conclusion that the students lack standing, we must consider Yale's contention that the students failed to state an FHA claim. We begin with the observation that plaintiffs allege no discriminatory intent on Yale's part, no facially discriminatory policy, and no facts sufficient to constitute disparate impact discrimination.

■ "[T]he reach of the [FHA] was to replace the ghettos 'by truly integrated and balanced living patterns.'" *Trafficante v. Metropolitan Life Ins. Co.*, 409 U.S. 205, 211, 93 S.Ct. 364, 34 L.Ed.2d 415 (1972) (quoting 114 Cong. Rec. 3422 (1968) (remarks of Sen. Mondale, drafter of the FHA)); *see also Huntington Branch, NAACP v. Town of Huntington*, 844 F.2d 926, 936 (2d Cir.) *aff'd in part*, 488 U.S. 15, 109 S.Ct. 276, 102 L.Ed.2d 180 (1988) (same). We have also said with respect to the FHA that "Congress intended that broad application of the anti-discrimination provisions would ultimately result in residential integration." *Town of Huntington*, 844 F.2d at 936. This inclusive purpose is reflected in the statutory language. Insofar as it is relevant to this case, the FHA declares that it is unlawful "(a) *[t]o refuse to sell or rent . . . or otherwise make unavailable or deny*, a dwelling to any person because of . . . religion . . . . [or] (b) [t]o discriminate against any person in the terms, conditions, or privileges of *sale or rental of a dwelling, or in the provision of services or facilities in connection therewith*, because of . . . religion. . . ." 42 U.S.C. § 3604(a), (b) (emphases added). However, the FHA does not require a landlord or seller to provide a reasonable accommodation with respect to an individual applicant's religion. *See* 42 U.S.C. § 3604(a)-(e). In summary, the FHA forbids those practices that make housing unavailable to persons on a discriminatory basis as well as discriminatory terms and conditions with respect to housing that is provided.

■ An FHA plaintiff may proceed on a theory of disparate intent or disparate impact. *See LeBlanc–Sternberg v. Fletcher*, 67 F.3d 412, 425 (2d Cir.1995). Therefore, in order to state an FHA claim, plaintiffs must allege either that Yale adopted an identified policy that denied them housing or granted them housing on discriminatory terms and conditions for reasons that were, in significant part, discriminatory or that the identified policy although adopted for neutral reasons has a discriminatory impact on the availability of housing for Orthodox Jews or the terms and conditions on which the housing is offered.

In judging whether the students stated a claim under either a disparate treatment or a disparate impact theory, we must "look only to the allegations of the complaint[,] . . . assume all well-pleaded factual allegations to be true, and . . . view all reasonable inferences that can be drawn from such allegations . . . in the light most favorable to the plaintiff[s]." *Dangler v. New York City Off Track Betting Corp.*, 193 F.3d 130, 138 (2d Cir.1999) (internal citation omitted). We must find these allegations to be sufficient "unless it appears beyond doubt that [the students] can prove no set of facts in support of [their] claim which would entitle [them] to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). This rule applies with special force to claims of civil rights violations. *See Easton v. Sundram*, 947 F.2d 1011, 1015 (2d Cir.1991). Moreover,

we may not affirm the dismissal of the students' complaint because they have proceeded under the wrong theory "so long as [they have] alleged facts sufficient to support a meritorious legal claim." *Northrop v. Hoffman of Simsbury, Inc.*, 134 F.3d 41, 45–46 (2d Cir.1997). However, plaintiffs must plead the requisite facts. *See, e.g. Davidson v. Flynn*, 32 F.3d 27, 31 (2d Cir.1994) (dismissing prisoner's procedural due process claim because he failed to allege particular due process violations).

Our first and most difficult task is identifying the practice that the students attack. According to the dissent, plaintiffs allege "that a facially neutral housing policy makes housing effectively unavailable to Orthodox Jews." [Dissent at 92.] Starting with this premise, the dissent finds that plaintiffs have stated a disparate impact claim under the Fair Housing Act. Although plaintiffs certainly allude to the allegedly discriminatory impact of Yale's lack of parietal rules, these allusions must be considered in light of the relief they requested. Plaintiffs do not ask us to force Yale to implement more conservative rules. Rather, they request only the following relief on their FHA claims: (1) "a declaratory judgment that Yale's policy of refusing to grant religion-based exemptions to its on-campus housing requirement, as applied and implemented by the defendants, unconstitutionally burdens the free exercise of religion, discriminates against and on the basis of religion, and ... that it therefore violates 42 U.S.C. § 3604"; (2) an injunction prohibiting the defendants "from enforcing, in the future, Yale's mandatory on-campus housing policy against students who cannot reside in such housing because of their religious convictions"; and (3) an order directing Yale to reimburse the plaintiffs for housing charges they paid under duress. These requests place the otherwise skeletal factual allegations of the amended complaint in perspective.

█ Of the three paragraphs in the FHA claim itself, the first merely incorporates by reference certain preceding factual allegations, and the second describes the applicable provisions of the FHA. Only the third paragraph describes plaintiffs' theory of liability. It states:

> By requiring the plaintiffs to pay for and live in rooms in co-educational residential colleges, despite the plaintiffs' religious objections to the sexual immodesty prevalent in Yale's dormitories, and by refusing to accommodate the plaintiffs' religious obligations, the defendants have discriminated against the plaintiffs, because of their religion, in the terms and conditions of a rental of a dwelling and in the provision of housing, in violation of the Fair Housing Act.

Am. Compl. ¶ 99. Among the incorporated factual allegations arguably relevant to the FHA claim is the students' contention that Yale allows other freshmen and sophomores to reside off campus for reasons such as age or marital status but refuses to allow an exception to its policy for religious reasons. Each of the four student plaintiffs requested a waiver of the requirement that they live on campus. In addition, the students claim that Orthodox Judaism prohibits "touching members of the opposite sex other than one's immediate relatives or spouse [and] living in a situation in which a person would have regular or repeated exposure to members of the opposite sex undressed or dressed immodestly." Am. Compl. ¶ 57. Finally, they claim that their counsel and "[v]arious third parties" have asked Yale to make unspecified reasonable accommodations to their beliefs or to grant them waivers, but Yale has refused. Am. Compl. ¶¶ 67–68. Plaintiffs do not ascribe any particular motivation to Yale's original requirement that freshmen live on campus but claim that Yale expanded the requirement to sophomores for the 1995–96 academic year "because it determined that too many Yale students were moving off campus, thereby reducing Yale's revenues from housing

charges to students." Am.Compl. ¶ 55. Although the factual allegations do not specify clearly the policies plaintiffs attack or the accommodations they requested, the relief demanded makes it clear that the policy plaintiffs claim violates the FHA is the defendants' refusal to exempt them from housing that they view as immoral. Plaintiffs request, pursuant to the FHA, the right to be excluded from housing, not the right to have on-campus housing that does not unduly burden their beliefs. Significantly, plaintiffs do not claim that defendants adopted their policy because of animus toward Orthodox Jews or that they grant exemptions to other religious groups or to students lacking a religious affiliation in a manner different from the exemption process for Orthodox Jews. Because plaintiffs seek exclusion from housing and not inclusion, they do not state an FHA claim. The purpose of the FHA is to promote integration and root out segregation, not to facilitate exclusion. See *Trafficante*, 409 U.S. at 211, 93 S.Ct. 364; *Town of Huntington*, 844 F.2d at 936. Because the complaint alleges neither intent to discriminate, nor a facially discriminatory policy, nor facts necessary to constitute disparate impact discrimination, nor even that the plaintiffs were excluded from housing, we believe sections 3604(a) and (b) cannot be stretched to cover plaintiffs' claim that the FHA gives them a right to be excluded from Yale housing. Thus, based on our reading of the complaint, we would affirm the district court's dismissal of plaintiffs' FHA claims.

Nevertheless, we also examine the interpretations of the complaint advanced in the plaintiffs' and amici's briefs and in the dissent. First, relying principally on *Le-Blanc–Sternberg*, the students argue that Yale's policy of requiring all unmarried freshman and sophomores under the age of twenty-one to reside on campus coupled with "the current absence of any traditional, reasonable parietal rules" violates the FHA because it effectively prevents them from access to Yale housing. Pls.' Br. at 37. Our dissenting colleague believes that plaintiffs have an actionable disparate impact claim based on this theory. In *Le-Blanc–Sternberg*, we—among other things—reversed a district court order setting aside an FHA jury verdict in favor of a group of Hasidic Jews and against the village of Airmont. *LeBlanc–Sternberg*, 67 F.3d at 424. The village had adopted a zoning code that arguably prohibited the use of home synagogues, which were necessary for the religious practice of Orthodox Jews. *Id.* at 417–20. We concluded that "there was ample support for the jury's implicit finding that Airmont's zoning code would be interpreted to restrict the use of home synagogues, [and] *that the motivation behind the enactment was discriminatory animus toward Orthodox and Hasidic Jews.*" *Id.* at 431 (emphasis added). The students, in contrast, do not allege any facts from which a discriminatory intent could be inferred, do not argue that defendants had a discriminatory intent, and, in fact, describe Yale's motive as economic. Because *LeBlanc–Sternberg* involved intentional discrimination, it does not support the plaintiffs' position.

Nor have the students adequately pleaded that Yale's facially neutral policy had a discriminatory impact. We apply Title VII disparate impact analysis to FHA claims. See *Town of Huntington*, 844 F.2d at 934 (applying Title VII analysis to public defendant); *Salute v. Stratford Greens Garden Apartments*, 136 F.3d 293, 302 (2d Cir.1998) (applying *Huntington* to private defendant). A "prima facie case is established by showing that the challenged practice of the defendant 'actually or predictably results in racial discrimination.'" *Town of Huntington*, 844 F.2d at 934 (quoting *United States v. City of Black Jack*, 508 F.2d 1179, 1184–85 (8th Cir. 1974)). In order to state a *prima facie* claim the students must allege a "causal connection between [a] facially neutral policy ... and the resultant proportion of minority" group members in the popula-

tion at issue. *Brown v. Coach Stores, Inc.*, 163 F.3d 706, 712 (2d Cir.1998). The students do not allege that Yale's policy has resulted in or predictably will result in under-representation of Orthodox Jews in Yale housing. Therefore, their claim fails. *See Brown*, 163 F.3d at 712; *Town of Huntington*, 844 F.2d at 934. We cannot read into their complaint the missing allegations crucial to a disparate impact claim because a Rule 12(b)(6) motion tests the adequacy of the complaint, *see Dangler*, 193 F.3d at 138, not the briefs. Moreover, plaintiffs, who are represented by able and experienced counsel, filed one amended complaint and did not move to further amend when confronted with defendants' motion.

Plaintiffs' second theory of liability is that Yale impermissibly discriminated against them on the basis of religion because it has a "policy of granting *ad hoc* and other exemptions and accommodations for secular reasons, but not for religious reasons." Pls.' Br. at 38. Nowhere in their complaint do plaintiffs allege that Yale has a system of "*ad hoc*" exemptions. Although they refer loosely to the granting of exemptions "for reasons other than religious conviction and belief," Am. Compl. ¶ 4, the only other reasons identified are age (over 21) and marital status. These exemptions apply to Orthodox Jews just as they apply to other students. However, even assuming that plaintiffs alleged the widespread grant of "*ad hoc*" exemptions, they would not have stated a claim under the FHA. As we previously discussed, one relevant section of the FHA contemplates a challenge to a denial or refusal of housing and the other relevant section contemplates a challenge to discriminatory terms or conditions offered with respect to housing that is provided or offered. Plaintiffs' allegation that defendants refused to grant them exemptions does not come within either of these sections because they do not allege that Yale's refusal was based on intent to discriminate, was a facially discriminatory policy, constituted disparate impact discrimination by resulting in an

under-representation of Orthodox Jews in Yale housing, or even caused them to be denied housing. Therefore, we affirm the district court's dismissal of the students' FHA claim. Having affirmed the dismissal of all of plaintiffs' federal claims, we also affirm the dismissal of plaintiffs' state law claims for lack of supplemental jurisdiction.

## CONCLUSION

For the foregoing reasons, we affirm the judgment of the district court.

MORAN, Senior District Judge, dissenting in part.

Before explaining why I must respectfully dissent from my colleagues' conclusion that plaintiffs have failed to state a claim under the Fair Housing Act, it is worth putting the students' claim in context. Yale has provided plaintiffs with rooms on the same basis as other students. In so doing, it differs from private landlords generally because it can and does require that the students rent the rooms. There are some exceptions to this policy. Married students, those over 21, and those who have completed their freshman and sophomore years are not required to live in the dormitories. According to the complaint, Yale claims that living in college dormitories is "integral" to a Yale education (at least for younger and unmarried freshmen and sophomores). Nonetheless, plaintiffs are not required to occupy the rooms they lease; they must simply pay for them. This fact, according to the students, reveals that the residency requirement stems, at least in part, from Yale's need to generate revenue from its student housing. Am. Compl. ¶ 55. Plaintiffs seek reimbursement for their redundant housing costs and, going forward, an order exempting them from the mandatory on-campus housing policy. This relief is necessary, they allege, because attempts to find alternative on-campus, single-sex

housing accommodations were unsuccessful. Am. Compl. ¶ ¶ 67–68.

I tend to agree that Yale's parietal rules are not what Congress had in mind when it originally enacted the Fair Housing Act. But that is not a basis for ruling, as RICO well illustrates. *See National Organization for Women v. Scheidler*, 510 U.S. 249, 262, 114 S.Ct. 798, 127 L.Ed.2d 99 (1994) (" '[T]he fact that RICO has been applied in situations not expressly anticipated by Congress does not demonstrate ambiguity. It demonstrates breadth.' ") (quoting *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 499, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985)) (other citations omitted). Although the relevant standards for a disparate impact claim under the Fair Housing Act are, at the moment, rather fluid,[1] there is ample authority to conclude that the complaint states a claim under sections 3604(a) and (b) of the FHA. Plaintiffs allege that a facially neutral housing policy makes housing effectively unavailable to Orthodox Jews, while the terms of that policy impose an additional financial burden on the basis of plaintiffs' religion. Plaintiffs further allege, in so many words, that Yale has unreasonably refused to adopt an alternative housing policy that would provide a comparably effective means of meeting the defendants' educational objective without imposing significant additional costs. Although these allegations are obscured by the morass of historical data directed toward a finding of state action, the necessary components of a disparate impact claim are surely present in the complaint.

Defendants seek to avoid the disparate impact theory of liability by contending, incorrectly, that discriminatory animus must be alleged to maintain a claim under § 3604(a). Def. Br. at 38. Distinguishing the result in *LeBlanc–Sternberg v. Fletcher*, 67 F.3d 412 (2d Cir.1995), the defendants, and now the majority, emphasize the "jury's implicit finding" in that case of some discriminatory intent lurking behind the challenged zoning ordinance. This argument is merely a strawman, for our cases, present and precedent, and those of our sister circuits make it quite clear that discriminatory animus need not be shown by plaintiffs proceeding under a theory of discriminatory effect.

In truth, the students rely on *LeBlanc–Sternberg* for the proposition that a wide variety of housing practices may create an injury cognizable under the FHA. Indeed, our opinion today confirms that the economic penalty imposed on devout Orthodox Jews subject to Yale's housing policy is sufficient to confer standing under the statute. I see no justification for demanding a more specific form of injury (*i.e.*, the rejection of an application for housing) or a particular form of relief (*i.e.*, "inclusion") in order for plaintiffs to meet the minimum pleading threshold. It is enough that defendants have allegedly imposed conditions on the acquisition of housing such that ostensibly available housing is effectively unavailable to a protected group. Given the liberality of pleading requirements under the federal rules,[2] I would remand the

---

1. *See* Peter E. Mahoney, *The Ends of Disparate Impact: Doctrinal Reconstruction, Fair Housing and Lending Law, and the Antidiscrimination Principle*, 47 Emory L.J. 409 (1998) (identifying factors which allowed competing disparate impact standards to develop); Thomas P. Vartanian, Robert H. Ledig, and Alisa Babitz, *Disparate Impact Discrimination: Fair Lending at a Crossroads*, 49 Consumer Fin. L.Q. Rep. 76 (1995) (noting the absence of a uniform standard of proof for housing-related disparate impact claims); Kristopher E. Ahrend, *Effect, or No Effect: A Comparison of Prima Facie Standards Applied in "Disparate Impact" Cases Brought Under*

the Fair Housing Act (Title VIII), 2 Race & Ethnic Ancestry L. Dig. 64 (1996).

2. On this point, see especially Judge Cabranes' opinion in *Northrop v. Hoffman of Simsbury, Inc.*, 134 F.3d 41, 45–46, 39 Fed. R.Serv.3d 492 (2d Cir.1997) (confirming that a litigant's failure to cite the correct statutory section does not require the court to affirm the dismissal of her complaint so long as she has alleged facts sufficient to support a meritorious legal claim), as well as *Albert v. Carovano*, 851 F.2d 561, 571 n. 3 (2d Cir.1988) (en banc) (citing *Newman v. Silver*, 713 F.2d 14, 15 n. 1 (2d Cir.1983)); *Flickinger v. Harold C.*

case for a decision on the merits of plaintiffs' claims under the Fair Housing Act.

## A. *The Disparate Impact Framework*

In order to evaluate whether plaintiffs have advanced a colorable claim under the Fair Housing Act, it is helpful to briefly examine the sources for and status of the relevant substantive standards for such a claim. For better or worse, we have hitched the Fair Housing Act to that itinerant alpha statute, Title VII of the Civil Rights Act of 1964. *See Huntington Branch, N.A.A.C.P. v. Town of Huntington,* 844 F.2d 926 (2d Cir.) (adopting the burden-shifting approach from Title VII employment discrimination cases and concluding that effect alone is sufficient to establish the prima facie case), *aff'd,* 488 U.S. 15, 109 S.Ct. 276, 102 L.Ed.2d 180 (1988) (affirming judgment); *Orange Lake Associates, Inc. v. Kirkpatrick,* 21 F.3d 1214, 1227 (2d Cir.1994) (confirming that Title VII framework provides the best model for disparate impact claims under the FHA, and collecting cases); *Pfaff v. U.S. Dept. of Housing and Urban Development,* 88 F.3d 739, 745 n. 1 (9th Cir. 1996); *Morgan v. Secretary of Housing and Urban Development,* 985 F.2d 1451, 1456 n. 4 (10th Cir.1993); *and see Smith v. City of Des Moines, Iowa,* 99 F.3d 1466, 1470 (8th Cir.1996) (observing that Title VII standards have "undergone several transformations in recent years").

The disparate impact path begins, of course, with *Griggs v. Duke Power Co.,* 401 U.S. 424, 432, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971), in which the Supreme Court recognized that Title VII provides a remedy not only for "overt discrimination but also [for]

practices that are fair in form, but discriminatory in operation." Under *Griggs,* a facially neutral employment practice which imposes a racially disproportionate burden on job applicants may violate Title VII even absent an intent to discriminate. This is so, the Court surmised, because "Congress directed the thrust of the Act to the *consequences* of employment practices, not simply the motivation." *Id.* at 432, 91 S.Ct. 849 (emphasis added). The enduring elements of disparate impact litigation have their source in the language of the Court's opinion:

> What is required by Congress is the removal of *artificial, arbitrary, and unnecessary barriers* to employment when the barriers operate invidiously to discriminate on the basis of racial or other impermissible classification.... The touchstone is *business necessity.* If an employment practice which operates to exclude Negroes cannot be shown to be related to job performance, the practice is prohibited.... Congress has placed on the employer the burden of showing that any given requirement must have a *manifest relationship* to the employment in question.

*Griggs,* 401 U.S. at 432, 91 S.Ct. 849 (emphasis added).

Later, however, in a series of significant decisions culminating in *Wards Cove Packing Co., Inc. v. Atonio,* 490 U.S. 642, 109 S.Ct. 2115, 104 L.Ed.2d 733 (1989), the Supreme Court redirected disparate impact analysis away from the principles voiced in *Griggs. See Albemarle Paper Co. v. Moody,* 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975); *Dothard v. Raw-*

Brown & Co., 947 F.2d 595, 600 (2d Cir.1991) ("[Defendant] ... point[s] out that [plaintiff] failed to plead the third party beneficiary theory in his complaint. To this, we simply respond that federal pleading is by statement of claim, not by legal theory."); *Michael v. Clark Equip. Co,* 380 F.2d 351, 352 (2d Cir. 1967); *Wade v. Johnson Controls, Inc.,* 693 F.2d 19, 21 (2d Cir.1982); *Bartholet v. Reishauer A.G. (Zurich),* 953 F.2d 1073 (7th Cir. 1992) (complaint does not have to state a

legal theory and specification of an incorrect theory is not fatal); *Sidney S. Art Co. v. Pipefitters Welfare Educ. Fund,* 25 F.3d 417, 421 (7th Cir.1994) ("The district court has a duty to consider whether a plaintiff's allegations could provide relief under any available legal theory."); 5A Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1357 (2d ed. 1990 & Supp.1979) ("any legal theory").

linson, 433 U.S. 321, 97 S.Ct. 2720, 53 L.Ed.2d 786 (1977); *New York City Transit Authority v. Beazer*, 440 U.S. 568, 99 S.Ct. 1355, 59 L.Ed.2d 587 (1979); *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 108 S.Ct. 2777, 101 L.Ed.2d 827 (1988). During this period, the Court recharacterized the relevance of a defendant's intent, *Wards Cove*, 490 U.S. at 660, 109 S.Ct. 2115; shifted the burden of persuasion entirely to the plaintiff, *id.* at 659–600, 109 S.Ct. 2115; and relaxed the employer's obligation to prove the challenged practice was a "business necessity," *id.* at 659, 109 S.Ct. 2115.

After two years of intense dialogue about antidiscrimination policy approaches, much lobbying and political posturing, a

presidential veto in 1990, innumerable amendments and revisions, and high level negotiations between congressional leaders and the Bush White House,[3] Congress passed the Civil Rights Act of 1991 ("Civil Rights Act"), Pub.L. 102–166, 105 Stat. 1071, codifying certain developments and reversing others in an effort to shore up Title VII's protections for victims of discrimination.[4] Key provisions of the Civil Rights Act and the only official legislative history pointedly reject several of the *Wards Cove* modifications. Various amendments confirmed that disparate impact claims are distinct from those alleging intentional discrimination[5]; reallocated the burdens of proof[6]; and restored the sub-

**3.** See Reginald C. Govan, *Honorable Compromises and the Moral High Ground: The Conflict Between Rhetoric and the Content of the Civil Rights Act of 1991*, 46 Rutgers L.Rev. 1 (1993), for a detailed analysis of the complex judicial, political, and legislative events which led to the passage of the Civil Rights Act.

**4.** "The Congress finds that ... the decision of the Supreme Court in *Wards Cove Packing Co. v. Atonio*, ... has weakened the scope and effectiveness of Federal civil rights protections; and ... legislation is necessary to provide additional protections against unlawful discrimination in employment." Civil Rights Act of 1991, Pub.L. 102–166 § 2(2) and (3) (1991).

**5.** *See* Pub.L. 102–166, § 102 (1991), 105 Stat 1071, 1072, codified at 42 U.S.C. § 1981a(a)(1) (distinguishing "intentional discrimination" from an "employment practice that is unlawful because of its disparate impact").

**6.** *See* Pub.L. 102–166, § 105 (1991), 105 Stat 1071, 1074, codified at 42 U.S.C. § 2000e–2(k)(1)(A)(i), which provides, in relevant part:

Sec 105. BURDEN OF PROOF IN DISPARATE IMPACT CASES.

(a) Section 703 of the Civil Rights Act of 1964 (42 U.S.C.2000e–2) is amended by adding at the end the following new subsection:

"(k)(1)(A) An unlawful employment practice based on disparate impact is established under this title only if—

(i) a complaining party demonstrates that a respondent uses a particular employment practice that causes a disparate impact on the basis of race, color, religion, sex, or national origin and the respondent fails to

demonstrate that the challenged practice is job related for the position in question and consistent with business necessity; or

(ii) the complaining party makes the demonstration described in subparagraph (C) with respect to an alternative employment practice and the respondent refuses to adopt such alternative employment practice.

(B)(i) With respect to demonstrating that a particular employment practice causes a disparate impact as described in subparagraph (A)(i), the complaining party shall demonstrate that each particular challenged employment practice causes a disparate impact, except that if the complaining party can demonstrate to the court that the elements of a respondent's decision making process are not capable of separation for analysis, the decision making process may be analyzed as one employment practice.

(ii) If the respondent demonstrates that a specific employment practice does not cause the disparate impact, the respondent shall not be required to demonstrate that such practice is required by business necessity.

(C) The demonstration referred to by subparagraph (A)(ii) shall be in accordance with the law as it existed on June 4, 1989, with respect to the concept of 'alternative employment practice.'

(2) A demonstration that an employment practice is required by business necessity may not be used as a defense against a claim of intentional discrimination under this title...."

(b) [added to the official notes accompanying 42 U.S.C. § 1981] No statements other than the interpretive memorandum ap-

stantive elements of a disparate impact claim to their pre-*Wards Cove* formulations.[7]  Under the amended statute, once a plaintiff has made the prima facie showing of disparate impact, the burden shifts to the defendant to demonstrate[8] that the challenged practice is "job related for the position in question and consistent with business necessity."  42 U.S.C. § 2000e–2(k)(1)(A)(i).

As to the substantive standards, the Purposes section provides that the Act was intended to

> codify the concepts of "business necessity" and "job related" enunciated by the Supreme Court in *Griggs v. Duke Power Co.*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971), and in other Supreme Court decisions prior to *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642, 109 S.Ct. 2115, 104 L.Ed.2d 733 (1989).

Pub.L. 102–166, § 3(2) (1991).  The problem is that scholars and courts disagree as to what standards Congress intended to codify.  *Compare* Michael Carvin, *Disparate Impact Claims Under the New Title VII*, 68 Notre Dame L.Rev. 1153 (1993) (arguing that *Wards Cove* is still good law

after The Civil Rights Act); *with* Note, *The Civil Rights Act of 1991: The Business Necessity Standard*, 106 Harv. L.Rev. 896 (1993) (asserting that *Wards Cove* does not survive the Act); Susan Grover, *The Business Necessity Defense in Disparate Impact Discrimination Cases*, 30 Ga. L.Rev. 387 (1996) (arguing for a strict business necessity standard under the Act).  Essentially, the competing interpretations turn on whether one views *Wards Cove* as consistent with and the inevitable result of earlier Supreme Court opinions, or whether the decision represented a significant departure from *Griggs* and its progeny.  The language of the statute successfully succumbs to either interpretation.

The Act's ambiguous language, however, while apparently necessary to sustain a fragile congressional compromise,[9] has allowed a number of contradictory standards to emerge.  *Compare Banks v. City of Albany*, 953 F.Supp. 28 (N.D.N.Y.1997), *with U.S. v. State of N.C.*, 914 F.Supp. 1257 (E.D.N.C.1996).  Further muddying current authority is the fact that a number of recent disparate impact cases have addressed claims to which the Act did not retroactively apply,[10] and it has not always

pearing at Vol. 137 Congressional Record S 15276 (daily ed.  Oct. 25, 1991) shall be considered legislative history of, or relied upon in any way as legislative history in construing or applying, any provision of this Act that relates to Wards Cove—Business necessity/cumulation/alternative business practice."

7. The "Purposes" section of the Civil Rights Act establishes that it was intended "(2) to codify the concepts of 'business necessity' and 'job related' enunciated by the Supreme Court in *Griggs v. Duke Power Co.*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971), and in the other Supreme Court decisions prior to *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642, 109 S.Ct. 2115, 104 L.Ed.2d 733 (1989)."  Pub.L. 102–166, § 3(2) (1991).  The "Findings" section states that "(2) the decision of the Supreme Court in *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642, 109 S.Ct. 2115, 104 L.Ed.2d 733 (1989) has weakened the scope and effectiveness of Federal civil rights protections;  and (3) legislation is necessary to provide additional protections against unlaw-

ful discrimination in employment."  Pub.L. 102–166, § 2(2) and (3) (1991).  The Act further provides that it was passed "to respond to recent decisions of the Supreme Court by expanding the scope of relevant civil rights statutes in order to provide adequate protection to victims of discrimination."  Pub.L. 102–166, § 3(4) (1991).

8. If there was any remaining question as to the extent of the parties' respective burdens, 42 U.S.C. § 2000e(m) establishes that the term "demonstrates" is defined to mean "meets the burdens of production and persuasion."

9. *See* Govan, *supra* n. 3, 46 Rutgers L.Rev. at 236–239.

10. *See Landgraf v. USI Film Products*, 511 U.S. 244, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994) (rejecting retroactive application of Civil Rights Act provision); *Rivers v. Roadway Express, Inc.*, 511 U.S. 298, 301–05, 114 S.Ct. 1510, 128 L.Ed.2d 274 (1994) (same).

been obvious whether courts are deciding claims based on pre-Act case law or new statutory standards. *See, e.g., E.E.O.C. v. Joint Apprenticeship Committee of the Joint Industry Board of the Electrical Industry,* 186 F.3d 110, 120 (2d Cir.1999) (allocating burdens of proof according to pre-Civil Rights Act case law); *E.E.O.C. v. Steamship Clerks Union, Local 1066,* 48 F.3d 594, 601 n. 5 (1st Cir.1995) (deciding disparate impact claim based on pre-Act standards).

Finally, although there is now consensus that Title VII standards govern claims under Title VIII,[11] it has not always been easy to translate principles designed to regulate employment relations into the realm of public and private housing. For instance, "job performance" may be more closely related to employment qualifications than "tenant performance" is to rental criteria. *See Resident Advisory Bd. v. Rizzo,* 564 F.2d 126, 148–49 (3rd Cir.1977) (observing that the error cost is higher in the employment realm); *Huntington,* 844 F.2d at 936 (noting the absence in Title VIII cases of a single objective akin to job performance). There are analogous, but not identical concerns at issue; just as there are analogous, but not identical provisions in the antidiscrimination statutes.

The toughest challenge is "to translate a body of precedent that simultaneously is

undergoing rapid evolution."[12] Mahoney, *supra* n. 1, at 419. Because the nature of cases under the Fair Housing Act varies dramatically—from landlord/tenant disputes to Section 8 housing participation, from lending practices to urban zoning conflicts—this translation is best accomplished piece by piece, but with an eye toward the development of a coherent methodology. This case presents a new set of facts over which the evolving Title VIII framework should be laid. It may be that plaintiffs have no remedy, but their claim should be allowed to proceed through discovery toward a resolution on the merits.

B. *The History of Disparate Impact Claims under the FHA*

The contours of disparate impact analysis under the FHA have been shaped in large part by the Title VII developments addressed above. The Eighth Circuit in 1974 was the first to recognize the validity of a disparate impact claim under the Fair Housing Act. *See U.S. v. City of Black Jack, Missouri,* 508 F.2d 1179 (8th Cir. 1974). Although the court crafted its test based on equal protection cases—authority invalidated shortly thereafter by *Washington v. Davis,* 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976)[13]—the existence of a

11. *See Huntington,* 844 F.2d at 934, 936.

12. There is no statutory provision which requires that we update FHA housing discrimination standards every time Title VII undergoes revision. There are several reasons, however, which make it advisable to keep the two regimes in step: (1) identical statutory foundations and recent legislative history indicate a congressional intention to maintain parallel frameworks; (2) both statutes share the same broad remedial and preventive goals; (3) it is more efficient to adapt Title VII standards than to begin from scratch; and (4) rule of law values are well served by making the link explicit and clearly specifying relevant exceptions. *See* Vartanian, *supra* n. 1, at 80 (outlining arguments for and against the applicability of new Title VII law to housing discrimination); *Resident Advisory Bd. v. Rizzo,* 564 F.2d 126, 147 (3rd Cir.1977) (noting identical "because of race" provisions and

Supreme Court's instruction to "construe both Title VII and Title VIII broadly so as to end discrimination"); Elliot M. Mincberg, Note, *Applying the Title VII Prima Facie Case to Title VIII Litigation,* 11 Harv. C.R.—C.L. L.Rev. 128, n. 103 (1976) (discussing statutory parallels); Mahoney, *supra* n. 1, at 448 (noting congressional reference to "business necessity" test in recent amendments to the Fair Housing Act).

13. Under the *Black Jack* formulation, "[o]nce the plaintiff has established a prima facie case by demonstrating racially discriminatory effect, the burden shifts to the governmental defendant to demonstrate that its conduct was necessary to promote a compelling governmental interest." *Black Jack,* 508 F.2d at 1188 & n. 4 (citing as authority "cases involving equal protection challenges to statutes or ordinances creating 'suspect classifications,' "

disparate impact claim under Title VIII was implicitly confirmed when the Supreme Court announced its decision in *Village of Arlington Heights v. Metropolitan Housing Development Corp. (Arlington Heights)*, 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977). *See Rizzo*, 564 F.2d at 146; Mahoney, *supra* n. 3 at 431–432 (discussing implications of unique procedural posture in *Arlington Heights*). In *Arlington Heights*, a non-profit housing developer and several of its potential low— and moderate-income tenants brought suit alleging that the city's failure to re-zone a 15–acre parcel from single-family to multiple-family classification constituted illegal housing discrimination under the Fourteenth Amendment and the Fair Housing Act. After dismissing plaintiffs' equal protection claims based on the lower courts' conclusion that the zoning board had not acted with a discriminatory purpose, *Arlington Heights*, 429 U.S. at 270–271, 97 S.Ct. 555, the Court remanded the case to the Seventh Circuit for consideration of plaintiffs' disparate impact claims under Title VIII, *id.* at 271, 97 S.Ct. 555.

On remand, the Seventh Circuit identified four factors to be evaluated in assessing whether conduct which produces a discriminatory impact will violate § 3604(a) of the FHA: (1) the strength of plaintiff's showing of discriminatory effect, (2) whether there is some evidence of discriminatory intent even if insufficient to satisfy the constitutional standards of *Washington v. Davis*, (3) the defendant's interest in taking the challenged action, and (4) whether the plaintiff seeks to compel the defendant to affirmatively provide housing for members of a protected class or merely to restrain the defendant from interfering with individual property owners who wish to provide such housing. *Metropolitan Housing Development Corp. v. Arlington Heights (Arlington Heights II)*, 558 F.2d 1283, 1290 (7th Cir.1977).

The Third Circuit took a different route. Relying on the Supreme Court's ·decision in *Arlington Heights*, the court held that proof of discriminatory effect alone would satisfy the prima facie burden for disparate impact claims under the FHA. *Resident Advisory Bd. v. Rizzo*, 564 F.2d 126, 148 (3rd Cir.1977). The *Rizzo* court then adapted the *Griggs* elements to the housing context. The court concluded that defendant's rebuttal case is established if the practice is shown to "serve, in theory and practice, a legitimate, bona fide interest of the Title VIII defendant, and ... that no alternative course of action could be adopted that would enable that interest to be served with less discriminatory impact." *Id.* at 149. If the defendant introduces evidence that no such alternative course of action could be adopted, the Third Circuit specified that the burden would once again shift to the plaintiff to demonstrate that other such practices are available.

Building upon *Arlington Heights II*'s "four-factor" approach or *Rizzo*'s "effect-only" standard and borrowing from the growing body of Title VII case law, other circuit courts began to formulate distinct tests for disparate impact claims under the FHA. *See* Ahrend, *supra* n. 1, (discussing the unresolved conflict among the circuit courts). Most circuits rejected the *Arlington Heights II* formulation to the extent that it examined the defendant's intent as a component of the prima facie case. If effect alone was sufficient under *Griggs*, it was also sufficient for claims under the FHA. *See Betsey v. Turtle Creek Assocs.*, 736 F.2d 983, 986 (4th Cir.1984) (holding that effect alone is sufficient to establish a prima facie case under the FHA); *Arthur v. City of Toledo, Ohio*, 782 F.2d 565, 576 (6th Cir.1986) (rejecting *Arlington Heights II*'s inclusion of intent as a factor, but adopting the other three); *United States v. Yonkers Bd. of Educ.*, 837 F.2d 1181, 1217 (2d Cir.1987) ("[T]he consensus is that a

including *In re Griffiths*, 413 U.S. 717, 93 S.Ct. 2851, 37 L.Ed.2d 910 (1973); and *Korematsu v. United States*, 323 U.S. 214, 65 S.Ct.

193, 89 L.Ed. 194 (1944)). *See* Mahoney, *supra* n. 1, at 427–430.

plaintiff need prove only discriminatory effect, and need not show that the decision complained of was made with discriminatory intent.").

In *Huntington Branch, N.A.A.C.P. v. Town of Huntington*, 844 F.2d 926, 928 (2d Cir.1988), we considered a challenge to a suburban zoning ordinance which restricted the development of multi-family housing projects to a largely minority "urban renewal area." The *Huntington* court's decision set forth the test that has continued to govern disparate impact FHA claims in this circuit. Relying on *Rizzo* and Title VII case law we held that the prima facie case is established by showing that the challenged practice "actually or predictably results in racial discrimination; in other words that it has a discriminatory effect." *Id.* at 934. Following *Griggs*, we emphasized that the plaintiff need not show that the housing decision was made with discriminatory intent. To require otherwise, we concluded, "would strip the statute of all impact on de facto segregation." *Id.* at 934–35. Once a plaintiff established the prima facie case, *Huntington* required the defendant to "prove that its actions furthered, in theory and in practice, a legitimate, bona fide governmental interest and that no alternative would serve that interest with less discriminatory effect."[14] *Id.* at 936.

*Huntington* rejected the inclusion of *Arlington Heights II*'s four factors as components of the prima facie case. "Employing the test in *Arlington Heights II* as a prima facie hurdle would cripple Title VIII." *Id.* at 934. Instead, the court determined that the three factors adopted in *City of Toledo*

(as well as any evidence of intent) are relevant for "the ultimate determination on the merits." *Id.* at 936. According to *Huntington*, in order to adjudge "the ultimate balance," the district court must assess whatever justifications the town advances and weigh them carefully against the degree of adverse effect shown by the plaintiff. *Id.* Even "substantial" interests in the housing policy "cannot, consistently with Title VIII, automatically outweigh significant disparate effects." *Id.* at 937. Although *Huntington*'s adherence to the Title VII burden shifting approach remains vital, *see Salute v. Stratford Greens Garden Apartments*, 136 F.3d at 312 (Calabresi, J. dissenting), the court's final "balancing of interests" should be revisited in light of the statutory codification of disparate impact analysis in the Civil Rights Act of 1991. *See Langlois v. Abington Housing Authority*, 207 F.3d 43, 51 (1st Cir. 2000).

C. *Relevant Burdens of Proof for Disparate Impact Claims under the Fair Housing Act*

1. The Prima Facie Case.

A prima facie case of disparate impact housing discrimination is established by showing that a particular facially-neutral practice actually or predictably imposes a disproportionate burden upon members of the protected class. *See Huntington*, 844 F.2d at 934; *Langlois v. Abington Housing Authority*, 207 F.3d 43, 49–50 (1st Cir.2000); *Pfaff v. U.S. Dept. of Housing and Urban Development*, 88 F.3d 739 (9th Cir.1996); *Orange Lake Associates, Inc., v.*

---

**14.** As discussed above, the *Huntington* formulation was tailored to suit claims against a public defendant. Courts applying the test to private defendants have merely omitted the word "governmental." *See, e.g., Salute v. Stratford Greens Garden Apartments*, 136 F.3d 293, 302 (2d Cir.1998) (defendant must "prove that its actions furthered, in theory and in practice, a legitimate, bona fide ... interest and that no alternative would serve that interest with less discriminatory effect"); *U.S. v. Salvation Army*, 1999 WL 756199, *9

(S.D.N.Y. Sept. 24, 1999) (same); *Bronson v. Crestwood Lake Section 1 Holding Corp.*, 724 F.Supp. 148, 154 (S.D.N.Y.1989) (stating that the "burden shifts to the defendants to present bona fide and legitimate justifications for their policies"). We agree with the Fourth Circuit's observation in *Betsey v. Turtle Creek Associates*, 736 F.2d 983, 988–989 n. 5 (4th Cir.1984), however, that the test for public defendants is not directly applicable to private defendants. *See* Mahoney, *supra* n. 1, at 449.

*Kirkpatrick,* 21 F.3d 1214, 1228 (2d Cir. 1994). To sustain a disparate impact claim under § 3604(b), plaintiffs must show that the challenged practice had an adverse impact on members of the protected class with respect to the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith. Under § 3604(a), plaintiffs must show that the challenged practice disproportionately excluded members of a protected group from a dwelling or from services or facilities connected therewith.[15] Discriminatory intent need not be shown. *Huntington,* 844 F.2d at 935; *Langlois,* 207 F.3d at 49–50; *United States v. Yonkers Bd. of Educ.,* 837 F.2d 1181, 1217 (2d Cir.1987). Nor should plaintiffs be required to address the other *Arlington Heights II* factors which some circuits have included in the prima facie case. *See Mountain Side Mobile Estates Partnership v. Secretary of Housing and Urban Development,* 56 F.3d 1243 (10th Cir.1995); *Arthur v. Toledo,* 782 F.2d 565, 575 (6th Cir.1986); *Smith v. Town of Clarkton,* 682 F.2d 1055, 1065 (4th Cir. 1982); *Snyder v. Barry Realty Inc.,* 953 F.Supp. 217, 220 (N.D.Ill.1996).[16] Indeed, in the housing context, it may often be the case that parties stipulate that a prima facie case (satisfying the elements of particularity, impact, and causation) has been established. *See Pfaff,* 88 F.3d at 746. The housing practices at issue are not likely to be part of a complex scheme of tests and qualifications and the adverse impact may be immediately apparent.

### 2. The Business Justification

As the First Circuit pointed out in *Langlois v. Abington Housing Authority,* 207 F.3d 43, 49–50 (1st Cir.2000), not every policy causing a disparate effect is unlawful. "[A] vast array of measures, from war-making and the federal budget to local decisions on traffic and zoning, may have a disparate impact. Thus, practically all of the case law, both in employment and housing, treats impact as doing no more than creating a prima facie case, forcing the defendant to proffer a valid justification.... Indeed, while Congress's amendment of the law after *Wards Cove Packing Co. v. Atonio* ... stiffened the employer's burden of justification, it left intact the principle that disparate impact merely creates a prima facie case." *Langlois,* 207 F.3d at 49–50. Thus, once a prima facie case of adverse impact is established, the inquiry turns to whether the defendant can

**15.** Contrary to Yale's assertion, plaintiffs need not make the specific prima facie showing accepted in *Robinson v. 12 Lofts Realty, Inc.,* 610 F.2d 1032, 1036–38 (2d Cir.1979), and echoed in *Soules v. U.S. Dept. of Housing & Urban Development,* 967 F.2d 817 (2d Cir. 1992). In *12 Lofts,* Robinson had alleged that he was the victim of a discriminatory denial of housing because of his race. Analogizing to *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), the court allowed plaintiff to establish his prima facie case by proving that he was black; that he applied for and was qualified to rent or purchase the housing; that he was rejected; and that the housing opportunity remained available. The court made clear that the evidence went far beyond establishing merely a discriminatory effect and readily permitted an inference of racially discriminatory motivation. Similarly, the court in *Soules* was reviewing an ALJ's determination with respect to a discriminatory denial of housing. Although the court included confirmation that an allegation of discriminatory effect is sufficient to state a claim under the Act, it is clear that the court was analyzing defendant's claim of discriminatory treatment, *i.e.* intentional discrimination. *Soules,* 967 F.2d at 821–22.

**16.** Recent decisions within the Seventh Circuit have begun to question whether the *Arlington Heights II* factors were intended to represent a prima facie hurdle. *See Hispanics United of DuPage County v. Village of Addison, Ill.,* 988 F.Supp. 1130, 1153 (N.D.Ill. 1997) (agreeing with *Huntington* that "treating the four factors as steps necessary to make out a prima facie case places too onerous a burden on [plaintiffs]"); *Cabrini–Green Local Advisory Council v. Chicago Housing Auth.,* 1997 WL 31002, *13 (N.D.Ill.1997) (concluding that four-factor test set out in *Arlington Heights II* "is more properly applied to a motion for summary judgment or by the fact finder at trial").

nonetheless avoid liability by defending the practice. *Huntington*, 844 F.2d at 936.

In the employment context, once a Title VII plaintiff has made out a prima facie case of disparate impact, the Civil Rights Act of 1991 shifts the burden of proof to the defendant, who must show that the challenged practice is "job related for the position in question and consistent with business necessity." 42 U.S.C. § 2000e–2(k)(1)(A)(i); *see Lanning v. Southeastern Pennsylvania Transp. Auth. (SEPTA)*, 181 F.3d 478, 485 (3rd Cir.1999), *cert. denied*, 528 U.S. 1131, 120 S.Ct. 970, 145 L.Ed.2d 840 (2000). As discussed above, the concepts of "business necessity" and "job related" are undefined in the statute, but "are intended to reflect the concepts enunciated by the Supreme Court in *Griggs v. Duke Power Co.*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971), and in the other Supreme Court decisions prior to *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642, 109 S.Ct. 2115, 104 L.Ed.2d 733 (1989)." Civil Rights Act, § 3(2) (1991); Interpretive Memorandum, 137 Cong. Rec. 28,680 (1991). As Judge Torres observed in *Donnelly v. Rhode Island Board of Governors for Higher Education*, 929 F.Supp. 583 (D.R.I.1996), *aff'd.* 110 F.3d 2 (1st Cir.1997), "consistent with" and "necessity" connote discordant ideas.

> Two things are consistent with one another if they are in harmony as opposed to being in conflict. On the other hand, something is a necessity if it is required or compelled. Since § 2000e–2(k)(1)(A)(i) uses these terms conjunctively, it is not clear whether Congress intended the standard to be that adherence to the challenged practice is required to conduct the employer's business; that the practice is closely related

to a legitimate business purpose; or something in between.

*Id.* at 593 (citations omitted).

Cobbling together the relevant statutory provisions, it appears that the phrase "consistent with business necessity" is shorthand for "consistent with the pre-*Watson/Wards Cove* conception of 'business necessity.'" The *Watson* plurality shifted the focus away from the employer's "need" for a particular practice because it is significantly correlated with job performance[17] and toward the legitimacy of the employer's business goals and whether the practice indeed contributed to those ends. In rejecting the final stages of this shift, Congress has required a Title VII defendant to justify not only the legitimacy of the ends, but also the necessity of the means. *Cf. Lanning*, 181 F.3d at 489; *Nash v. Consolidated City of Jacksonville, Duval County, Fla.*, 895 F.Supp. 1536, 1545 (M.D.Fla.1995) ("[T]he Civil Rights Act of 1991 ... restor[ed] pre-*Wards Cove* law in which, *inter alia*, ... 'business necessity' really means 'necessity.' "), *aff'd*, 85 F.3d 643 (11th Cir.1996).

Judge Torres concluded that the "business necessity" test evaluates whether the practice is "reasonably necessary to achieve an important business objective." *Donnelly*, 929 F.Supp. at 593. Other courts have reached similar formulations. *See Banks v. City of Albany*, 953 F.Supp. 28, 35 (N.D.N.Y.1997) ("[T]he defendant must show that the challenged action is demonstrably necessary to meet an important business goal."); *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1118 (11th Cir.1993) (defendant must show "that the practice or action is necessary to meeting a goal that, as a matter of law, qualifies as an important business goal for Title VII purposes"); *Mountain Side*, 56 F.3d at 1254 ("[T]he

---

**17.** *See, e.g., Albemarle*, 422 U.S. at 431, 95 S.Ct. 2362 (holding that "discriminatory tests are impermissible unless shown, by professionally acceptable methods, to be 'predictive of or significantly correlated with important elements of work behavior which are relevant to the job or jobs for which candidates are being evaluated' "); *Dothard*, 433 U.S. at 332 n. 14, 97 S.Ct. 2720 (indicating that "a discriminatory employment practice," such as a discriminatory cutoff score on an entry level exam, "must be shown to be *necessary* to safe and efficient job performance to survive a Title VII challenge").

burden shifts to the defendant to produce evidence of a 'genuine business need' for the challenged practice.") (citing *Griggs,* 401 U.S. at 432, 91 S.Ct. 849); *see also Pfaff,* 88 F.3d at 747 & n.3 (rejecting application of "compelling business necessity" formulation). The *Donnelly* formulation is a fair reflection of the mandate of the Civil Rights Act of 1991 and is compatible with the relevant considerations attendant to a fair housing claim.

### 3. *Alternative Practices Showing*

If the defendant can show that the practice was reasonably necessary to achieve an important business objective, the plaintiff will prevail only if he or she can prove that the defendant unreasonably refused to adopt an alternative housing practice that would serve the defendant's legitimate objective with less discriminatory impact. *See Albemarle,* 422 U.S. at 425, 95 S.Ct. 2362; 42 U.S.C. § 2000e–2(k)(1)(A)(ii) and (C). Factors such as the cost or other burdens of the proposed policy are relevant to a determination as to whether the defendant's refusal to adopt an alternative housing procedure was reasonable. *See Watson,* 487 U.S. at 998, 108 S.Ct. 2777. If plaintiffs have suggested another policy which would serve the defendant's legitimate objectives but would also add significant new costs or create tremendous upheaval or seriously under-

mine other legitimate objectives, a refusal to accept the alternative will not be viewed as unreasonable.[18] If, on the other hand, the alternative housing practice would be comparably effective without imposing significant new burdens, the defendant's refusal to adopt the practice will be deemed unlawful housing discrimination. Correspondingly, to qualify as "an alternative housing practice," the policy must be feasible, must be comparably effective in serving the landlord's legitimate business objective, and must not significantly exceed the cost or burden of the challenged practice. *Albemarle,* 422 U.S. at 425, 95 S.Ct. 2362; *Dothard,* 433 U.S. at 329, 97 S.Ct. 2720; *Fitzpatrick,* 2 F.3d at 1118.

It is also worth noting here that the alternative practices demonstration is not about pretext. Yes, evidence showing a policy's disparate impact can be evidence of intentional discrimination, but evidence of—or even an inference of—intentional discrimination is unnecessary to prevail on a claim of disparate impact.[19] In *Huntington,* we confirmed that a plaintiff need not show that the decision complained of was made with discriminatory intent. 844 F.2d at 934. We noted that a refusal to require intent was entirely consistent with our previous cases, the congressional purpose behind Title VIII, related Title VII jurisprudence and practical concerns. *Id.* We also, therefore, rejected the lower court's hold-

---

**18.** Of course, " 'Courts are generally less competent than employers to restructure business practices,' *Furnco Construction Corp. v. Waters,* 438 U.S. 567, 578, 98 S.Ct. 2943, 2950, 57 L.Ed.2d 957 (1978); consequently, the judiciary should proceed with care before mandating that an employer must adopt a plaintiff's alternative selection or hiring practice in response to a Title VII suit." *Wards Cove,* 490 U.S. at 660, 109 S.Ct. 2115.

**19.** Other courts have a different position on this issue. Judge Harold Greene of the District Court for the District of Columbia observed more than a decade ago that the relevance of a private landlord's intent

> is unfortunately not entirely clear from a reading of the decided cases. Several decisions are inconsistent with each other; others are incomplete in significant respects;

and still others do not distinguish between the relevant concepts. While, to be sure, proof of discriminatory intent by the landlord seems everywhere to be regarded as establishing a violation of the statute, *see Betsey v. Turtle Creek Associates,* 736 F.2d 983, 986 (4th Cir.1984), there is a variety of opinion, usually not reconciled in any systemic fashion, whether a violation may also be predicated solely on proof that the landlord[']s actions had a discriminatory effect. . . .

*Brown v. Artery Org., Inc.,* 654 F.Supp. 1106, 1114 (D.D.C.1987). There is even less agreement today. In fact, the sands appear to be shifting even within the circuits. *See* Ahrend, *supra* n. 1 (noting new standards floated in Third and Seventh Circuits).

ing that if the defendants articulated a legitimate, nondiscriminatory reason for their conduct, the plaintiffs would be required to show that the reason was a "pretext." *See Huntington,* 668 F.Supp. at 782, 787. We noted that the *McDonnell Douglas* test "is an intent-based standard for disparate treatment cases inapposite to the disparate impact claim asserted here." *Huntington,* 844 F.2d at 939 (discussing *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)); *see also International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977); *Wards Cove Packing Co. v. Atonio,* 490 U.S. 642, 667, 109 S.Ct. 2115, 104 L.Ed.2d 733 (1989) (Stevens, J. dissenting) (pointing out that *McDonnell Douglas* provides the appropriate methodology to identify disparate treatment absent direct proof of intent).

Moreover, the 1991 Act clearly repudiates the "pretext" approach. It omits any mention of "pretext" and refers to disparate impact claims as distinct from those involving intentional discrimination. *See, e.g.,* 42 U.S.C. § 1981a(a)(1), as amended, regarding "Damages in cases of intentional discrimination in employment." The provision establishes that a defendant who "engaged in unlawful intentional discrimination (*not an employment practice that is unlawful because of its disparate impact*)" may be liable for compensatory and punitive damages under the subsection. *Id.* (emphasis added). By memorializing this distinction in the statutory text, Congress has rejected the notion, proposed by some commentators, that "the dominant purpose [of disparate impact theory] is preventing pretextual discrimination." *See* George Rutherglen, *Disparate Impact Under Title VII: An Objective Theory of Discrimination,* 73 Va.L.Rev. 1297, 1315 (1987); *see also,* Vartanian, *supra* n. 1, at 78 & n. 15 (discussing defeat of the McCollum Amendment which would have required

some proof of intentional discrimination before a creditor could be held liable for the disparate impact caused by a facially-neutral pattern or practice).

In sum, based on the recodification of disparate impact standards for Title VII claims and on the emerging case law interpreting those standards in the housing context, a plaintiff proceeding under the Fair Housing Act may prevail on a disparate impact claim, as opposed to one for intentional discrimination, only if (1) the plaintiff shows that the defendant employs a particular housing policy or practice that imposes a disproportionate burden on a protected group and (2)(a) the defendant fails to demonstrate that the challenged practice is reasonably necessary to achieve a legitimate business objective, or (b) the plaintiff proves that the defendant unreasonably refused to adopt an alternative housing practice that would provide a comparably effective means of meeting the defendant's objective without imposing significant additional costs.

D. *Adoption of Alternative Practices v. Accommodation*

In alleging liability under the Fair Housing Act, the students protest Yale's "refus[al] to accommodate the plaintiffs' religious obligations." Am. Compl. ¶ 99. Their statement either misapprehends the law (as the majority believes), is a misnomer for the alternative practices requirement, or merely alludes to failed negotiations with the defendants. Again, it is helpful to examine the substantive provisions of the antidiscrimination statutes before assessing the adequacy of the pleading, for the burden imposed upon a private defendant by the "alternative practice" requirement is necessarily less than "accommodation" unless the plaintiff meets certain statutory criteria.[20]

Congress has twice amended anti-discrimination statutes expressly to create an obligation to "accommodate" the unique

20. The two concepts have on occasion been relied upon together without any real distinc-

tion. *See, e.g., Martin v. Constance,* 843 F.Supp. 1321 (E.D.Mo.1994).

characteristics of a protected class. Under Title VII there is a duty to accommodate an employee's religious practices; in the housing context there is a duty to accommodate an individual's "handicap."

### 1. *Accommodation under the FHAA*

In 1988, Congress passed the Fair Housing Amendments Act of 1988 ("FHAA"), Pub.L. 100–430, 102 Stat. 1619, amending 42 U.S.C. §§ 3601–3619, to extend the FHA's promise of equal opportunity in housing to individuals with handicaps. *See Salute v. Stratford Greens Garden Apartments,* 136 F.3d 293, 299–300 (2d Cir.1998). Under the new provisions, it is unlawful to "make unavailable or deny, a dwelling to any buyer or renter" or to "discriminate ... in the terms, conditions, or privileges or sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling" because of a person's handicap.[21] 42 U.S.C. § 3604(f)(1) and (2). Part (3) of subsection (f) requires a landlord to make "reasonable accommodations" when "necessary to afford ... equal opportunity [for a handicapped person] to use and enjoy a dwelling." 42 U.S.C. § 3604(f)(3)(B). If the reasonable accommodations provision is triggered, a defendant may be required to incur "reasonable costs" to accommodate a plaintiff's handicap, "provided such accommodations do not pose an undue hardship or a substantial burden." *Salute,* 136 F.3d at 300 (quoting *Shapiro v. Cadman Towers, Inc.,* 51 F.3d 328, 335 (2d Cir.1995)).[22] The FHAA limits the duty to accommodate exclusively to meet the needs of handicapped individuals and says nothing regarding a duty to accommodate religious beliefs.

### 2. *Religious Accommodation under the Civil Rights Act of 1964*

Earlier, Congress added section 701(j) to the Civil Rights Act of 1964, *see* Pub.L. 92–261, § 2(7) (1972), codified at 42 U.S.C. § 2000e(j), "to illuminate the meaning of religious discrimination under the statute." *Ansonia Board of Education v. Philbrook,* 479 U.S. 60, 63 & n. 1, 107 S.Ct. 367, 93 L.Ed.2d 305 (1986). The definitions section of Title VII was amended to provide that "[t]he term 'religion' includes all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business." Under this definition, an employee can bring suit under Title VII based on the theory that the employer's failure to accommodate the employee's religious expression constitutes actionable discrimination. *See Trans World Airlines, Inc. v. Hardison,* 432 U.S. 63, 97 S.Ct. 2264, 53 L.Ed.2d 113 (1977); *Chalmers v. Tulon Co. of Richmond,* 101 F.3d 1012, 1018 (4th Cir.1996).

No such amendment has been made to the Fair Housing Act. Indeed, the term religion is not defined at all. *See Barlow v. Evans,* 993 F.Supp. 1390 (D.Utah 1997) (considering whether prohibition of religious discrimination in provision of housing provides protection for polygamist). While it may generally be appropriate to look to the definitions contained in other anti-discrimination statutes when a key term is undefined, importing Title VII's duty to accommodate religious practices into the FHA would exceed this court's authority to " 'fill[ ] a gap left by Congress'

---

**21.** 42 U.S.C. § 3602(h) defines "handicap" as (1) a physical or mental impairment which substantially limits one or more of such person's major life activities, (2) a record of having such an impairment, or (3) being regarded as having such an impairment, but such term does not include current, illegal use of or addiction to a controlled

substance (as defined in section 802 of Title 21).

**22.** Landlords are also obligated to permit reasonable modifications of the premises, although they need not pay for the alterations and certain conditions may be attached. 42 U.S.C. § 3604(f)(3)(A).

silence' [and would effectively] 'rewrit[e] rules that Congress has affirmatively and specifically enacted.'" *See Matter of Oswego Barge Corp.*, 664 F.2d 327, 339 (2d Cir.1981) (*quoting Mobil Oil Corp. v. Higginbotham*, 436 U.S. 618, 625, 98 S.Ct. 2010, 56 L.Ed.2d 581 (1978)). The lower court was correct, therefore, in its conclusion that the FHA does not require Yale to make reasonable accommodations for the students' religious obligations. *Hack*, 16 F.Supp.2d at 193.

It is not clear, however, that plaintiffs are in fact seeking an "accommodation." Even if we assume that Yale's parietal rule is reasonably necessary and is not an artificial, arbitrary, or unnecessary practice, there is apparently a viable alternative housing policy: Yale can provide exemptions for plaintiffs and others similarly situated. Certainly, Yale is not obligated to restructure its housing program anymore than an owner of a rooming house would be obligated to change his method of operation because plaintiffs sought to live there, and plaintiffs do not seek that relief. True, the current policy of permitting plaintiffs to live elsewhere is an alternative with less discriminatory effect. It does not, however, eliminate the disproportionate financial burden on Orthodox Jews who must pay for two apartments. Thus, exemption may be an even better alternative, although not necessarily the only one. I do not mean to suggest that plaintiffs, choosing to go to Yale, can transfer an economic burden occasioned by their religious beliefs from themselves to Yale. There is, however, no reason to believe that Yale would have to carry vacant student housing space if a few freshmen and sophomores were exempted. Each year the college is faced with far more significant variables: how many approved applicants will enroll, how many will return, what will be the mix of married and unmarried or younger and older students. At least at this juncture we are given no reason to believe that a few exemptions will have any significant economic impact upon Yale.

## CONCLUSION

"Dismissal of a complaint before discovery is a drastic step. It is a device that must not be employed 'unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief.'" *Wade v. Johnson Controls, Inc.*, 693 F.2d 19, 22 (2d Cir.1982) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974)) (other citations omitted); *see also Geisler v. Petrocelli*, 616 F.2d 636 (2nd Cir.1980). "This caution against dismissal applies with even greater force where the complaint is pro se, or where the plaintiff complains of a civil rights violation." *Easton v. Sundram*, 947 F.2d 1011, 1015 (2d Cir.1991) (citations omitted). Given our conclusion that plaintiffs have standing to pursue their antidiscrimination claims under the FHA and given the allegations in the complaint as to the effective unavailability of student housing at Yale for a defined class of Orthodox Jews, I must respectfully dissent from my colleagues' affirmance. I would remand to the district court for discovery and further proceedings on the merits. It should be left to the finder of fact to determine whether the policy had a discriminatory effect on Orthodox Jews, whether the mandatory on-campus policy is reasonably necessary to achieve an important business objective of Yale College, and, if so, whether Yale unreasonably refused to adopt an alternative, feasible policy that would have provided a comparably effective means of meeting Yale's educational and financial objectives without imposing significant additional burdens.